UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDDIE ECHEVARRIA MALDONADO,
        Plaintiff,

                V.                          CIVIL ACTION NO.
                                            18-11255-ADB

NANCY A. BERRYHILL, Acting
Commissioner of the Social
Security Administration,
        Defendant.

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE**
**COMMISSIONER (DOCKET ENTRY # 16); DEFENDANT'S MOTION TO AFFIRM**
**THE COMMISSIONER'S DECISION (DOCKET ENTRY # 18)**

**September 4, 2019**

**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties,

plaintiff Eddie Echevarria Maldonado ("plaintiff") and defendant

Nancy A. Berryhill, Acting Commissioner of the Social Security

Administration ("the Commissioner").  Plaintiff seeks to reverse

or remand the decision of the Commissioner pursuant to 42 U.S.C.

§ 405(g).  (Docket Entry # 16).  The Commissioner moves for an

order to affirm the decision.  (Docket Entry # 18).  On March 4,

2019, this court conducted a hearing and thereafter took both

motions (Docket Entry ## 16, 18) under advisement.

PROCEDURAL HISTORY

In early 2013, plaintiff filed an application for

disability insurance benefits.  (Docket Entry # 13-8, Tr. 529-

30).  Plaintiff filed an additional application for supplemental
security income ("SSI") in December 2013.  (Docket Entry # 13-8,
Tr. 538-46).  In both applications, plaintiff alleged disability
rendering him unable to work as of January 25, 2013.  (Docket
Entry # 13-8, Tr. 529, 538).  The Social Security Administration
("SSA") denied both claims on June 27, 2014.  (Docket Entry #
13-7, Tr. 442-55).  Plaintiff then filed a request for
reconsideration, which was denied on November 18, 2014.  (Docket
Entry # 13-7, Tr. 461-62, 466-76).

     Plaintiff requested a hearing before an Administrative Law
Judge ("AJL") on December 1, 2014.  (Docket Entry # 13-7, Tr.
477-78).  The AJL conducted a hearing on April 29, 2016.
(Docket Entry # 13-5, Tr. 294-338).  Both plaintiff and a
vocational expert ("VE") testified at the hearing (Docket Entry
# 13-5, Tr. 294-338).  In an August 26, 2016 decision, the ALJ
concluded that plaintiff was not disabled under 42 U.S.C. §§
216(i), 223(d), 1614(a)(3)(A) for the period of January 25, 2013
through the date of the ALJ's decision.  (Docket Entry # 13-2,
Tr. 15-32).

     Plaintiff requested a review of the ALJ's decision by the
Appeals Council on October 21, 2016.  (Docket Entry # 13-7, Tr.
526-28).  The Appeals Council denied the request for review on
May 7, 2018, thereby affirming the ALJ's decision as final.
(Docket Entry # 13-2, Tr. 1-4).  Plaintiff subsequently filed

this action against the Commissioner pursuant to 42 U.S.C. §
405(g).

FACTUAL BACKGROUND

I.   Plaintiff's Age, Education, and Work History

Plaintiff, born on October 30, 1967, was 45 years old on
the date of his application for disability insurance benefits,
and 46 years old on the date of his application for supplemental
security income.  (Docket # 13-8, Tr. 529, 538).  He holds a
high school diploma and has past relevant work experience as an
auto parts salesperson and a handyman.  (Docket Entry # 13-5,
Tr. 306, 308-10).  Plaintiff alleged an inability to work as of
January 25, 2013 and claimed that he suffered from both physical
and psychological conditions.  (Docket Entry # 13-5, Tr. 311-23,
529) (Docket Entry # 13-8, Tr. 538).

II.  Plaintiff's Medical History

A.   Physical Conditions[1]

On February 10, 2013, plaintiff was admitted to the
emergency room at St. Luke's Memorial Hospital in Ponce, Puerto
Rico for bilateral leg pain.  (Docket Entry # 13-23, Tr. 1915-
17).  The attending physician, Alexandra Vega Lagares, M.D.

---

[1]  The record indicates that plaintiff suffers from numerous
cardiac conditions, including coronary artery disease and
ischemic heart disease.  However, because these impairments do
not form the basis for plaintiff's claims before this court,
they are not addressed in detail.

("Dr. Vega Lagares") observed no edema in plaintiff's
extremities and attributed his discomfort to uncontrolled blood
glucose levels. (Docket Entry # 13-23, Tr. 1916). Dr. Vega
Lagares subsequently diagnosed plaintiff with peripheral
neuropathy.[2] (Docket Entry # 13-23, Tr. 1916).

On April 23, 2013, plaintiff completed an adult function
report.[3] (Docket Entry # 13-9, Tr. 576-84). Therein, he
reported that his physical ailments negatively impact his
ability to care for himself, indicating that he struggles to
raise and lower his legs when dressing and bathing. (Docket
Entry # 13-9, Tr. 578). Plaintiff reported that he prepares his
own meals, but only spends ten to 15 minutes at a time preparing
food, as it is painful for him to spend more than short periods
of time on his feet. (Docket Entry # 13-9, Tr. 578). Plaintiff
further indicated that he is unable to independently complete
tasks around the house, such as washing clothes or cleaning, and
depends on his wife to do the shopping. (Docket Entry # 13-9,

---

[2] Peripheral neuropathy is a condition resulting from damage to
peripheral nerves (nerves outside of the brain and spinal cord)
that can result in symptoms such as numbness, burning or
prickling sensations, and muscle weakness, among others. The
Mayo Clinic, Peripheral neuropathy (2019),
https://www.mayoclinic.org/diseases-conditions/peripheral-
neuropathy/symptoms-causes/syc-20352061.
[3] Plaintiff's wife, Brenda Figueroa Torres, completed this form
in Spanish on behalf of plaintiff. (Docket Entry # 13-9, Tr.
584). The above summary of the form's content is an unofficial
translation.

Tr. 579-80).  Plaintiff reported that because of the strong pain
in his legs, he leaves the house only when he has medical
appointments.  (Docket Entry # 13-9, Tr. 580).  Plaintiff
indicated that he remains capable of managing his own money and
paying bills.  (Docket Entry # 13-9, Tr. 580).

On July 3, 2013, plaintiff underwent a consultative
examination with Nilma E. Rosado Villanueva, M.D. ("Dr. Rosado
Villanueva").  (Docket Entry # 13-12, Tr. 858-69).  At the
examination, plaintiff reported a history of uncontrolled
diabetes, high blood pressure, multiple heart attacks, and chest
pain.  (Docket Entry # 13-12, Tr. 858).  Plaintiff reported
being hospitalized six times between 1998 and 2013 due to chest
pain, coronary artery disease, and uncontrolled diabetes,
including a hospitalization for the placement of four stents in
his heart.  (Docket Entry # 13-12, Tr. 858-59).  Plaintiff
further reported experiencing frequent cramping, numbness, and
spasms in his legs and shortness of breath during moderate
physical activity.  (Docket Entry # 13-12, Tr. 859).  Dr. Rosado
Villanueva noted that plaintiff used a cane for gait stability
on his right side.  (Docket Entry # 13-12, Tr. 858, 860).  Upon
physical examination, Dr. Rosado Villanueva observed "[p]alpable
peripheral pulses" and lack of edema in plaintiff's legs.
(Docket Entry # 13-12, Tr. 860).  Plaintiff also exhibited a
full range of motion and normal muscle strength in the upper and

lower extremities.  (Docket Entry # 13-12, Tr. 860, 865-66).
Dr. Rosado Villanueva ultimately assessed diabetes, diabetic
neuropathy, and left ventricular hypertrophy in addition to
plaintiff's history of coronary artery disease and high blood
pressure.  (Docket Entry # 13-12, Tr. 861).

State agency physician Ivan Arzola, M.D. ("Dr. Arzola")
completed a physical portion of a "Disability Determination
Explanation" at the initial level on September 21, 2013.
(Docket Entry # 13-6, Tr. 339-49).  He determined that plaintiff
suffers from multiple medically determinable impairments,
including ischemic heart disease, which Dr. Arzola assessed as
severe, as well as essential hypertension, diabetes, and
peripheral neuropathy, all of which Dr. Arzola assessed as non-
severe.  (Docket Entry # 13-6, Tr. 347).  Dr. Arzola's physical
residual functional capacity ("RFC") assessment reflects that
plaintiff is capable of lifting 50 pounds occasionally and 25
pounds frequently.  (Docket Entry # 13-6, Tr. 347-48).  Dr.
Arzola also assessed that plaintiff can stand and/or walk with
normal breaks for approximately six hours in an eight-hour
workday.  (Docket Entry # 13-6, Tr. 348).  Dr. Arzola's RFC
assessment further notes that plaintiff is capable of sitting
with normal breaks for approximately six hours in an eight-hour
workday.  (Docket Entry # 13-6, Tr. 348).

On September 23, 2013, plaintiff was admitted to the emergency room at Lowell General Hospital. (Docket Entry # 13-12, Tr. 895-929). He complained of persistent bilateral leg pain and estimated that it began in January 2013. (Docket Entry # 13-12, Tr. 898). Emergency Department Nurse Tracey Correia-Mcgowan, RN prescribed plaintiff acetaminophen and tramadol for the pain. (Docket Entry # 13-12, Tr. 909-27). Plaintiff was additionally given educational materials relating to peripheral neuropathy, a diabetic diet, and the health effects of smoking. (Docket Entry # 13-12, Tr. 909-27).

On October 1, 2013, plaintiff established care with Mukund Gupta, M.D. ("Dr. Gupta") at Lowell Community Health Center. (Docket Entry # 13-14, Tr. 1088-90). As part of his medical history, plaintiff reported current tobacco use and estimated smoking between 11 and 19 cigarettes per day. (Docket Entry # 13-14, Tr. 1088). Upon a physical examination, Dr. Gupta observed no edema and noted that despite plaintiff's knees being sensitive to palpitation, plaintiff exhibited a normal range of motion in his extremities. (Docket Entry # 13-14, Tr. 1089). Dr. Gupta assessed plaintiff's diabetes as poorly controlled and referred him to diabetic management for counseling on diet. (Docket Entry # 13-14, Tr. 1089). Dr. Gupta also referred plaintiff to Scott Sigman, M.D. ("Dr. Sigman"), an orthopedist,

for possible osteoarthrosis in plaintiff's knees.  (Docket Entry # 13-14, Tr. 1089).

On November 13, 2013, plaintiff saw Dr. Sigman at Merrimack Valley Spine Center.  (Docket Entry # 13-13, Tr. 1040-42).  Dr. Sigman observed that plaintiff ambulated with a normal gait and did not walk with any assistive device.  (Docket Entry # 13-13, Tr. 1041).  Upon a physical examination, Dr. Sigman noted that plaintiff had a small open wound on his left calf.  (Docket Entry # 13-13, Tr. 1041).  Dr. Sigman further observed normal range of motion in both knees, despite tenderness when palpitated, and general atrophy in both right and left quadriceps.  (Docket Entry # 13-13, Tr. 1041).  Plaintiff underwent x-rays in both knees on the same day and Dr. Sigman assessed patellofemoral chondromalacia.  (Docket Entry # 13-13, Tr. 1041-42).  Dr. Sigman recommended "outpatient physical therapy and bilateral knee braces," and noted that he would not recommend or consider cortisone injections until plaintiff's blood sugars were under control and the wound on his left leg had healed.  (Docket Entry # 13-13, Tr. 1041-42).

Beginning on November 20, 2013, plaintiff attended six sessions of outpatient physical therapy at Northeast Rehabilitation Hospital Network ("Northeast"), which was

ultimately halted at the direction of plaintiff's physician.[4]
(Docket Entry # 13-13, Tr. 999-1007).  Plaintiff attended a
second round of physical therapy sessions at Northeast the
following year from June 20 to August 13, with no change in
plaintiff's overall level of pain.  (Docket Entry # 13-15, Tr.
1182-96).

On December 8, 2013, plaintiff was admitted to the
emergency room at Lowell General Hospital complaining of
numbness in his right leg from his knee down to his toes.
(Docket Entry # 13-13, Tr. 965-94).  The attending physician,
Barry Fisher, M.D. ordered and subsequently reviewed the results
of a CT scan of plaintiff's brain.  (Docket Entry # 13-14, Tr.
1096).  The CT scan noted no intracranial hemorrhaging and
ultimately found that no intracranial pathology could be
identified based on the scan.  (Docket Entry # 13-14, Tr. 1096).
He ultimately diagnosed plaintiff with paresthesia.  (Docket
Entry # 13-13, Tr. 968).

Plaintiff saw his primary care provider, Dr. Gupta, for a
follow-up visit several days later on December 9, 2013.  (Docket
Entry # 13-14, Tr. 1083-85).  Dr. Gupta examined plaintiff and
observed no edema in his extremities, but noted that plaintiff
appeared to be experiencing decreased sensation to light touch

---

[4]  The record does not specify which of plaintiff's doctors
halted the physical therapy treatment.

in his right leg, and referred plaintiff to a neurologist for
electromyography[5] ("EMG").  (Docket Entry # 13-14, Tr. 1085).  On
December 13, 2013, plaintiff saw Vladan Milosavljevic, M.D.
("Dr. Milosavljevic") at New England Neurological Associates,
P.C.  (Docket Entry # 13-14, Tr. 1125).  Dr. Milosavljevic
performed the EMG and found the results to be abnormal "showing
mostly axonal sensory polyneuropathy." (Docket Entry # 13-14,
Tr. 1125-26).

On January 8, 2014, plaintiff saw his orthopedist, Dr.
Sigman.  (Docket Entry # 13-13, Tr. 1037-39).  Plaintiff
underwent x-rays of his lumbar spine and pelvis.  (Docket Entry
# 13-13, Tr. 1038).  Dr. Sigman reviewed the results and
observed "no significant degenerative change." (Docket Entry #
13-13, Tr. 1039).  He also reviewed plaintiff's EMG results from
a month prior and opined there was clear evidence of axonal
sensory polyneuropathy in plaintiff's right leg consistent with
diabetic neuropathy.  (Docket Entry # 13-13, Tr. 1039).  Dr.
Sigman ordered an MRI of plaintiff's right knee to assess any
intra-articular pathology and noted that if no obvious surgical
pathology was found to be present, conservative pain management

---

[5]  Electromyography is performed to assess the health and
functioning of muscles and motor neurons.  Results from the
procedure can reveal nerve and muscle defects and/or disfunction
in nerve to muscle signal transmission.  The Mayo Clinic,
Electromyography, (2019), https://www.mayoclinic.org/tests-
procedures/emg/about/pac-20393913.

with a regular exercise program would be appropriate treatment.
(Docket Entry # 13-13, Tr. 1039).  Dr. Sigman further noted that
due to plaintiff's poor diabetic control, he was unwilling to
consider a cortisone injection at that time.  (Docket Entry #
13-13, Tr. 1039).

Plaintiff saw Dr. Sigman again on February 3, 2014.
(Docket Entry # 13-13, Tr. 1034-36).  At the appointment,
plaintiff reported continued pain and discomfort in his right
knee, as well as anterior thigh and leg pain radiating down into
his ankles.  (Docket Entry # 13-13, Tr. 1034).  Dr. Sigman
reviewed the results of an MRI of plaintiff's right knee and
observed "articular cartilage fissuring over the patella
consistent with patellofemoral chondromalacia." (Docket Entry #
13-13, Tr. 1035).  Dr. Sigman ordered an arterial ultrasound on
plaintiff's right lower leg to test for peripheral vascular
disease before evaluating further treatment.  (Docket Entry #
13-13, Tr. 1035).

On February 19, 2014, plaintiff's primary care provider,
Dr. Gupta, completed an EAEDC[6] Medical Report in support of an
application by plaintiff to the Massachusetts Department of
Transitional Assistance ("DTA") for state disability benefits.
(Docket Entry # 13-13, Tr. 1008-16).  In the report, Dr. Gupta

---

[6]  EAEDC is an acronym for Emergency Aid to the Elderly,
Disabled, and Children.

assessed only plaintiff's physical health.  (Docket Entry # 13-
13, Tr. 1011-16).  Under the "[c]onclusions" section of the
report, Dr. Gupta checked a box indicating that plaintiff
suffers from "a physical, mental health, or cognitive
impairment(s) that does not meet or equal the Department's
Medical Standards or the SSI Listing of Impairments but does
affect his or her ability to work."  (Docket Entry # 13-13, Tr.
1015).  Under the same section of the report, Dr. Gupta
indicated that plaintiff's impairment was expected to last six
to 12 months.  (Docket Entry # 13-13, Tr. 1015).

On February 20, 2014, plaintiff began meeting with Pamela
Smith, RN ("Smith") for regular counseling on diabetes
management.  (Docket Entry # 13-14, Tr. 1079-80).  A random
blood sugar test administered by Smith during the visit revealed
that plaintiff's glucose levels were very high at 332 mg/dl.
(Docket Entry # 13-14, Tr. 1079).  Smith discussed with
plaintiff the importance of adhering to a diabetic diet and
testing his blood sugar levels regularly.  (Docket Entry # 13-
14, Tr. 1079).  Smith further advised plaintiff that an increase
or change in medication might be necessary to obtain better
control of his glucose levels.  (Docket Entry # 13-14, Tr.
1079).

On February 24, 2014, plaintiff returned to Merrimack
Valley Spine Center to see Dr. Sigman.  (Docket Entry # 13-13,

Tr. 1031-33).  Plaintiff underwent an arterial ultrasound to
gauge the possibility of peripheral vascular disease.  (Docket
Entry # 13-13, Tr. 1031).  Dr. Sigman assessed the results of
the vascular study as "unremarkable."  (Docket Entry # 13-13,
Tr. 1032).  Plaintiff received a cortisone injection in his
right knee in an effort to keep treatment conservative.  (Docket
Entry # 13-13, Tr. 1032-33).  Dr. Sigman noted that he also
reviewed a patellofemoral home exercise program with plaintiff.
(Docket Entry # 13-13, Tr. 1033).

On April 2, 2014, plaintiff saw Dr. Gupta at Lowell
Community Health Center for a follow-up appointment.   (Docket
Entry # 13-14, Tr. 1077-78).  Plaintiff reported that while the
pain in his right knee had improved after the cortisone
injection by Dr. Sigman in February, he continued to experience
persistent pain in his right thigh and leg.  (Docket Entry # 13-
14, 1077).  Dr. Gupta noted that plaintiff's diabetes was poorly
controlled, with a random blood sugar draw measuring plaintiff's
glucose levels at 310 mg/dl.  (Docket Entry # 13-14, Tr. 1077).
Dr. Gupta counseled plaintiff on the importance of compliance
with treatment, directed him to increase his Lantus insulin
dosage and instructed him to follow up with Smith for further
counseling on diabetes management.  (Docket Entry # 13-14, Tr.
1077).  At the conclusion of the visit, Dr. Gupta provided
plaintiff with a letter recommending accommodations in the form

13

of a first-floor apartment due to plaintiff's ambulatory
difficulties.  (Docket Entry # 13-13, Tr. 1029).

On April 21, 2014, plaintiff underwent a consultative
examination by Asha Saxena, M.D. ("Dr. Saxena") at University of
Massachusetts Disability Evaluation Services.  (Docket Entry #
13-14, Tr. 1070-72).  At the examination, plaintiff reported a
history of bilateral knee pain, hand and leg pain and cramping,
diabetes, chondromalacia, and depression.  (Docket Entry # 13-
14, Tr. 1070-71).  Plaintiff also reported smoking approximately
half a pack of cigarettes per day.  (Docket Entry # 13-14, Tr.
1071).  When questioned, plaintiff admitted to being able to
perform activities of daily living normally.  (Docket Entry #
13-14, Tr. 1072).  Dr. Saxena observed that plaintiff's gait was
slow and that he appeared to walk with a slight limp.  (Docket
Entry # 13-14, Tr. 1071).  Dr. Saxena further noted that
plaintiff struggled to rise to his feet from a seated or
reclined position, was unable to walk on his heels or toes, and
could not perform a squat.  (Docket Entry # 13-14, Tr. 1071).
Additionally, Dr. Saxena observed a restricted range of movement
in plaintiff's knees, and noted that plaintiff experienced
moderate pain upon extension and rotation of his knees.  (Docket
Entry # 13-14, Tr. 1071).  Plaintiff reported to Dr. Saxena that
his knees occasionally lock up and that he wears knee braces for
added stability.  (Docket Entry # 13-14, Tr. 1071).  Dr. Saxena

14

observed slightly weakened motor strength in both legs.  (Docket
Entry # 13-14, Tr. 1071).  Plaintiff self-reported "feeling
tired" when "he stands or walks for more than 10-15 minutes" at
a time and being unable to walk for more than half a block.
(Docket Entry # 13-14, Tr. 1072).

On May 12, 2014, plaintiff saw Dr. Gupta at Lowell
Community Health Center for a follow-up appointment.  (Docket
Entry # 13-14, Tr. 1075-76).  Plaintiff complained of persistent
pain in both his right and left knees.  (Docket Entry # 13-14,
Tr. 1075).  Dr. Gupta noted that plaintiff's diabetes was poorly
controlled and opined that the pain plaintiff was experiencing
in his extremities was linked to diabetic neuropathy.  (Docket
Entry # 13-14, Tr. 1075-76).

On May 19, 2014, state agency physician Jane McInerny, M.D.
("Dr. McInerny") completed a physical RFC at the initial level
(Docket Entry # 13-6, Tr. 382-83).  Dr. McInerny's physical RFC
reflects that plaintiff is capable of lifting 50 pounds
occasionally, and 20 pounds frequently.  (Docket Entry # 13-6,
Tr. 382).  Dr. McInerny further assessed that plaintiff could
stand or walk, with normal breaks, for approximately six hours
in an eight-hour workday and could sit, with normal breaks, for
the same length of time.  (Docket Entry # 13-6, Tr. 382-83).
Additionally, Dr. McInerny indicated that plaintiff has postural
limitations allowing him to climb stairs frequently, climb

15

ladders or scaffolds occasionally, stoop frequently, and kneel,
crouch, and crawl occasionally.  (Docket Entry # 13-6, Tr. 383).
Dr. McInerny did not find that plaintiff had any manipulative,
visual, communicative, or environmental limitations.  (Docket
Entry # 13-6, Tr. 383).

On May 30, 2014, plaintiff saw Smith for diabetes
counseling at Lowell Community Health Center.  (Docket Entry #
13-14, Tr. 1146-47).  Smith noted that plaintiff's diabetes was
poorly controlled, and that he was not using his insulin
injections properly.  (Docket Entry # 13-14, Tr. 1146).  Smith
provided plaintiff with written instructions in Spanish on the
correct order, time, and dosage of insulin.  (Docket Entry # 13-
14, Tr. 1146).  During a follow-up appointment on June 11, 2014,
Smith noted that plaintiff's blood glucose levels had improved
with the correction in plaintiff's use of insulin.  (Docket
Entry # 13-14, Tr. 1143-44).  Plaintiff continued to go to the
Lowell Community Health Center for diabetes counseling for the
next six months.  (Docket Entry # 13-14, Tr. 1139-40) (Docket
Entry # 13-24, Tr. 1933-49).

On June 16, 2014, plaintiff saw Dr. Gupta at Lowell
Community Health Center for a follow-up appointment.  (Docket
Entry # 13-14, Tr. 1141-42).  Dr. Gupta noted that plaintiff's
glucose levels had improved since beginning diabetes counseling.
(Docket Entry # 13-14, Tr. 1141-42).  Dr. Gupta further noted

that plaintiff was continuing to struggle with pain in his right
inner thigh, and referred him to Dr. Milosavljevic for further
testing.  (Docket Entry # 13-14, Tr. 1141-42).  Dr.
Milosavljevic subsequently performed an EMG on July 16, 2014 and
observed no change since plaintiff's prior test.  (Docket Entry
# 13-14, Tr. 1127).

On August 1, 2014, plaintiff saw Dr. Gupta at Lowell
Community Health Center for a routine follow-up appointment.
(Docket Entry # 13-14, Tr. 1137-38).  Dr. Gupta assessed
plaintiff's diabetes as once again poorly controlled, at least
in part due to poor adherence to treatment.  (Docket Entry # 13-
14, Tr. 1137).

On August 4, 2014, Dr. Sigman of Merrimack Valley Spine
Center reviewed the results of plaintiff's recent EMG and noted
no major changes from plaintiff's previous test.  (Docket Entry
# 13-14, Tr. 1173-74).  Dr. Sigman further observed that
plaintiff had experienced excellent results with the cortisone
injection in his right knee and recommended that plaintiff
"continue physical therapy and use of a brace."  (Docket Entry #
13-14, Tr. 1173-74).  At a follow-up appointment on October 6,
2014, Dr. Sigman administered a cortisone injection to
plaintiff's left knee following plaintiff's complaints of pain
and discomfort.  (Docket Entry # 13-18, Tr. 1526-28).

On September 2, 2014, plaintiff completed another adult function report. (Docket Entry # 13-10, Tr. 654-57). He reported his daily activities as consisting of taking his medication, watching television, preparing meals, and bathing. (Docket Entry # 13-10, Tr. 654). He indicated that the constant pain in his legs interferes with his ability to sleep, and that he struggles to bend his knees, which makes dressing and bathing difficult. (Docket Entry # 13-10, Tr. 655). He also indicated that the pain in his legs causes him significant mental stress and has contributed to his depression. (Docket Entry # 13-10, Tr. 655). Plaintiff indicated that he occasionally forgets to take his medication. (Docket Entry # 13-10, Tr. 656). Plaintiff wrote that he prepares his own meals daily, often eating cereal for breakfast and sandwiches for lunch and dinner. (Docket Entry # 13-10, Tr. 656). Plaintiff further reported that he is able to do his own laundry and perform "basic" cleaning and other chores around the house. (Docket Entry # 13-10, Tr. 656). Plaintiff noted that he does these "things with difficulty" and at his own pace. (Docket Entry # 13-10, Tr. 656). Plaintiff reported going outside only when he feels well enough to do so or when he has "an appointment." (Docket Entry # 13-10, Tr. 657). Plaintiff also noted that he shops for groceries every two weeks and is able to pay his own bills and manage a checking account. (Docket Entry # 13-10, Tr. 657)

On November 11, 2014, state agency physician K. Malin
Weeratne, M.D. ("Dr. Weeratne") completed a physical RFC at the
reconsideration level.  (Docket Entry # 13-6, Tr. 408-09).  Dr.
Weeratne offered an opinion of plaintiff's physical RFC matching
that previously given by Dr. McInerny in May 2014.  (Docket
Entry # 13-6, 382-83, 408-09).

On March 9, 2015, plaintiff underwent a diabetic eye
examination by John Capino, M.D. ("Dr. Capino").  (Docket Entry
# 13-17, Tr. 1444-45).  Dr. Capino assessed bilateral diabetic
macular edema, noting that it was "[c]linically significant" and
at "[h]igh risk of progression."  (Docket Entry # 13-17, Tr.
1445).  Dr. Capino further assessed "non-proliferative diabetic
retinopathy" and "hypertensive retinopathy."  (Docket Entry #
13-17, Tr. 1445).

On April 13, 2015, plaintiff saw Dr. Gupta at Lowell
Community Health Center for a follow-up appointment.  (Docket
Entry # 13-24, Tr. 1922-23).  Dr. Gupta observed continued
ulcers on plaintiff's left leg and prescribed a topical
antibacterial ointment.  (Docket Entry # 13-24, Tr. 1922).  Dr.
Gupta further observed that plaintiff's diabetes was "poorly
controlled."  (Docket Entry # 13-24, Tr. 1923).  During this
appointment, plaintiff admitted to missing his most recent
diabetes counseling appointment.  (Docket Entry # 13-24, Tr.
1922).  At a subsequent appointment on April 27, 2015, Dr. Gupta

noted that the ulcer on plaintiff's left leg had improved somewhat, but that plaintiff's blood glucose levels continued to be "poorly controlled." (Docket Entry # 13-24, Tr. 1921). Dr. Gupta discussed with plaintiff at length the "need for improved compliance" with treatment. (Docket Entry # 13-24, Tr. 1921).

On May 4, 2015, plaintiff underwent a doppler ultrasound and waveform analysis on both of his lower legs to determine the root cause of his chronic ulcers. (Docket Entry # 13-17, Tr. 1449). Paul Burke, M.D. ("Dr. Burke") performed the examination at Non-Invasive Vascular Diagnostics located in North Chelmsford, Massachusetts. (Docket Entry # 13-17, Tr. 1449). He noted that the study was ultimately inconclusive, as he observed normal circulation in both extremities. (Docket Entry # 13-17, Tr. 1449). A subsequent ultrasound performed by Calin Vasiliu, M.D. ("Dr. Vasiliu") on June 25, 2015 at Non-Invasive Vascular Diagnostics revealed "chronic venous insufficiency" in plaintiff's right leg. (Docket Entry # 13-17, Tr. 1452). Dr. Vasiliu assessed plaintiff as failing conservative therapy with conservative measures, resulting in lifestyle-limiting symptoms. (Docket Entry # 13-17, Tr. 1452).

On June 30, 2015, plaintiff established care with Miguel Ariza, M.D. ("Dr. Ariza") at the Lowell Diabetes & Endocrine Center in North Chelmsford. (Docket Entry # 13-18, Tr. 1458-61). Plaintiff reported poor glycemic control and admitted to

missing insulin injections once per day. (Docket Entry # 13-18,
Tr. 1458). Dr. Ariza agreed that plaintiff's glycemic control
was very poor and assessed major barriers to improvement due to
lack of diabetes education and plaintiff's longstanding non-
compliance with treatment. (Docket Entry # 13-18, Tr. 1459).
Dr. Ariza recommended that plaintiff follow up with the diabetes
center to receive further education and assistance with
management of his condition. (Docket Entry # 13-18, Tr. 1459).

On August 29, 2015, plaintiff was admitted to the emergency
room at Lowell General Hospital for chronic ulcers on his left
leg that had recently become infected. (Docket Entry # 13-21,
Tr. 1681-1755). Plaintiff reported recently having returned
from a visit to Puerto Rico "and the infection worsened during
that time." (Docket Entry # 13-21, Tr. 1692). Doris Pliskin,
M.D. performed an incision and drainage of plaintiff's wound.
(Docket Entry # 13-21, Tr. 1691). The infectious disease unit
noted "significant improvement in the infection" following the
procedure, and plaintiff was discharged shortly thereafter.
(Docket Entry # 13-21, Tr. 1692).

On September 15, 2015, plaintiff underwent an ultrasound on
his right leg at Non-Invasive Vascular Diagnostics. (Docket
Entry # 13-17, Tr. 1450). Dr. Vasiliu reviewed the results of
the ultrasound and met with plaintiff again on October 8, 2015.
(Docket Entry # 13-17, Tr. 1452). Dr. Vasiliu stated that she

was unwilling to "recommend an ablation" at this stage, and
noted that gaining control over plaintiff's diabetes was of
greater immediate concern.  (Docket Entry # 13-17, Tr. 1452).

On December 29, 2015, plaintiff saw Dr. Ariza at Lowell
Diabetes & Endocrine Center for a follow-up appointment.
(Docket Entry # 13-18, Tr. 1466-68).  Plaintiff reported poor
glycemic control and recounted several hyperglycemic episodes
that had occurred while he was visiting family in Puerto Rico.
(Docket Entry # 13-18, Tr. 1466).  Plaintiff reported suffering
from low blood glucose levels three times per week on average.
(Docket Entry # 13-18, Tr. 1466).  Dr. Ariza noted that
plaintiff was not compliant with a diabetic diet and had never
followed up with the diabetes center.  (Docket Entry # 13-18,
Tr. 1466).  Dr. Ariza ordered diagnostic labs to be completed by
the following week at the latest.  (Docket Entry # 13-18, Tr.
1468).

On February 2, 2016, Dr. Ariza reviewed the results of the
labs and noted that plaintiff's blood glucose control was "very
poor."  (Docket Entry # 13-18, Tr. 1470-71).  Dr. Ariza further
noted that plaintiff should bring his glucose meter to his next
appointment, as the blood glucose readings that plaintiff had
self-reported to Dr. Ariza's office did not match the lab
results.  (Docket Entry # 13-18, Tr. 1472).  On February 3,
2016, plaintiff spoke to a representative from Dr. Ariza's

22

office by phone and informed her that he had not yet scheduled a
follow-up appointment with the diabetes center.  (Docket Entry #
13-18, Tr. 1471).  Plaintiff further reported to the
representative that he had been complying with treatment for his
high cholesterol levels, but a subsequent phone call to
plaintiff's pharmacy revealed that his cholesterol medication
had not been refilled since July 2015.  (Docket Entry # 13-18,
Tr. 1471).

On February 25, 2016, plaintiff saw Damian Folch, M.D.
("Dr. Folch").  (Docket Entry # 13-23, Tr. 1882).  Plaintiff
complained of pain in his left arm, and Dr. Folch ordered an x-
ray.  (Docket Entry # 13-23, Tr. 1882).  The x-ray was taken the
same day by Bruce Hall, M.D. ("Dr. Hall"), who noted "no
fracture or dislocation."  (Docket Entry # 13-23, Tr. 1894-95).
Dr. Hall did observe moderate degenerative change in the
acromioclavicular joint "without significant hypertrophy" and
noted that it was an otherwise normal exam.  (Docket Entry # 13-
23, Tr. 1895).

Approximately one month later, on March 21, 2016, plaintiff
saw Benjamin Henkle, M.D. ("Dr. Henkle") at the Lowell General
Hospital Pain Center.  (Docket Entry # 13-5, Tr. 283-87).
Plaintiff complained of neck and left arm pain that he rated a
seven on a scale out of ten.  (Docket Entry # 13-5, Tr. 283).
Dr. Henkle assessed "left cervical radiculopathy" and suggested

23

physical therapy two to three times per week for a minimum of
six weeks, with a transition to a home exercise program.
(Docket Entry # 13-5, Tr. 287).  Dr. Henkle noted that he would
consider a cervical epidural steroid injection if plaintiff's
pain did not improve with physical therapy.  (Docket Entry # 13-
5, Tr. 287).

B.  Mental Conditions

On May 20, 2014, state agency consultant Daniel Morocco,
Ed.D ("Morocco"), a psychologist, conducted a clinical
diagnostic interview with plaintiff at University of
Massachusetts Disability Evaluation Services.  (Docket Entry #
13-14, Tr. 1098-1101).  Plaintiff reported to Morocco that his
daily activities consist of cleaning, cooking, doing laundry,
and watching television.  (Docket Entry # 13-14, Tr. 1099).  He
further reported difficulty dressing and bathing independently
due to his knee problems.  (Docket Entry # 13-14, Tr. 1099).
Plaintiff described feeling "depressed almost all the time," but
denied having any homicidal or suicidal ideations or
experiencing any auditory or visual hallucinations.  (Docket
Entry # 13-14, Tr. 1100).  Plaintiff admitted to engaging in
self harm at some time in the past, but could not recall exactly
when this occurred.  (Docket Entry # 13-14, Tr. 1100).

Morocco observed some impairment in plaintiff's judgment,
insight, and memory, noting that plaintiff struggled to remember

24

some "personal historical facts." (Docket Entry # 13-14, Tr.
1099-1100). While plaintiff had some difficulty with retention
and at times needed questions repeated, plaintiff nonetheless
appeared to understand all of Dr. Morocco's questions and did
not ultimately have any difficulty with comprehension. (Docket
Entry # 13-14, Tr. 1099). Morocco noted that plaintiff appeared
agitated and had some difficult relating throughout the
interview. (Docket entry # 13-14, Tr. 1099). Dr. Morocco
observed that plaintiff appeared uncomfortable in this type of
interpersonal situation. (Docket Entry # 13-14, Tr. 1099).
With respect to plaintiff's ability to adapt to work-like
activities, Morocco opined that plaintiff would have "difficulty
following multistep directions," "completing multistep tasks,"
and "relating to many different individuals." (Docket Entry #
13-14, Tr. 1099). However, Morocco assessed that plaintiff is
capable of following "short and simple" directions and
completing simple tasks in a work environment. (Docket Entry #
13-14, Tr. 1099). On the basis of the interview, Morocco
diagnosed plaintiff with major depressive disorder moderate with
anxious distress. (Docket Entry # 13-14, Tr. 1100).

On June 23, 2014, plaintiff underwent a consultative
examination with David Husson, Psy.D ("Dr. Husson") of
Disability Determination Services. (Docket Entry # 13-14, Tr.
1119-24). Plaintiff primarily reported suffering from physical

25

health problems, including diabetes and neuropathy. (Docket Entry # 13-14, Tr. 1119-20). When questioned by Dr. Husson, plaintiff reported feeling "sad and somewhat helpless" about his current medical problems and anxious about his health. (Docket Entry # 13-14, Tr. 1119). Plaintiff explicitly denied experiencing suicidal thoughts, hallucinations, or delusions. (Docket Entry # 13-14, Tr. 1119). Dr. Husson noted that plaintiff's affect was "mildly constricted" and that his mood throughout the interview was mildly dysphoric. (Docket Entry # 13-14, Tr. 1121). However, Dr. Husson also assessed plaintiff's thought processing as coherent, and his insight and judgment as adequate. (Docket Entry # 13-14, Tr. 1121). Dr. Husson further assessed normal cognitive functioning and found no evidence of major social impairments. (Docket Entry # 13-14, Tr. 1122). With respect to plaintiff's functional capacity, Dr. Hussson opined that plaintiff is able to follow short, basic instructions. (Docket Entry # 13-14, Tr. 1122). Dr. Husson acknowledged that plaintiff has some limitations involving pace, persistence, and concentration from an emotional perspective, but that these limitations "seem to be caused by his reported physical health problems." (Docket Entry # 13-14, Tr. 1122).

On June 26, 2014, state agency consultant Julie Cohen, Ph.D ("Dr. Cohen") reviewed the records and completed a psychiatric review technique form and a mental RFC at the initial level.

(Docket Entry # 13-6, Tr. 361-62, 364-66).  Dr. Cohen found that
plaintiff's affective and anxiety-related disorders mildly
restrict plaintiff's social functioning and ability to partake
in activities of daily living, and moderately restrict his
ability to maintain concentration, persistence, or pace.
(Docket Entry # 13-6, Tr. 362).  Dr. Cohen further assessed
moderate limitations in plaintiff's "ability to maintain
attention and concentration for extended periods" of time,
"ability to carry out detailed instructions," and "ability to
complete a normal workday . . . without interruptions from
psychologically based symptoms."  (Docket Entry # 13-6, Tr.
365).  Dr. Cohen opined that while plaintiff's psychological
symptoms moderately limit his "ability to sustain focus and pace
for detailed tasks," he remains capable of successfully
completing simple tasks.  (Docket Entry # 13-6, Tr. 365-66).
Dr. Cohen noted that plaintiff's primary difficulties appear to
be medical, and that "he is experiencing some low-level down
mood and anxiety secondary to his physical ailments."  (Docket
Entry # 13-6, Tr. 366).  Dr. Cohen emphasized that plaintiff
remains "[a]ble to understand and recall simple information,"
"sustain attention and pace"[7] for simple tasks, "relate

_____

[7]  Dr. Cohen indicated that plaintiff is capable of sustaining
pace and attention for up to two hours at a time, eight hours
per day, and 40 hours per week.  (Docket Entry # 13-6, Tr. 366).

adequately" to others, and "understand and respond to simple
change(s)." (Docket Entry # 13-6, Tr. 366).

On July 23, 2014, plaintiff underwent an initial screening
for mental health counseling with Ester Lam, M.Ed ("Lam") at
Lowell Community Health Center. (Docket Entry # 13-32, Tr.
2122). Plaintiff reported feeling depressed and nervous, and
complained of difficulty sleeping and racing thoughts. (Docket
Entry # 13-32, Tr. 2122). Lam noted that plaintiff appeared
teary eyed throughout the visit, but exhibited a coherent
thought process and displayed "[n]o signs of psychosis."
(Docket Entry # 13-32, Tr. 2122). Lam ultimately assessed
depression and referred plaintiff to therapist Olga Madrid for
individual therapy. (Docket Entry # 13-32, Tr. 2122).

On September 15, 2014, plaintiff saw Olga Madrid ("Madrid")[8]
for an initial therapy session at Lowell Community Health
Center. (Docket Entry # 13-17, Tr. 1382-85). Plaintiff
reported anxiety and constant sadness, crying spells, and
difficulty sleeping at night. (Docket Entry # 13-17, Tr. 1382).
Additionally, plaintiff reported some auditory and visual
hallucinations beginning approximately six months prior.
(Docket Entry # 13-17, Tr. 1382). Plaintiff also admitted to

---

[8]  Madrid holds a master's degree. (Docket Entry # 13-17, Tr.
1383) (Docket Entry # 13-30, Tr. 1974, 1979). The parties agree
that beginning in September 2014, Madrid was plaintiff's
therapist. (Docket Entry # 17, p. 4) (Docket Entry # 19, p. 5).

having some suicidal thoughts, but expressed that he was able to
control them by concentrating on a different activity or by
telephoning a friend or family member.  (Docket Entry # 13-17,
Tr. 1382).  Madrid assessed "[s]evere recurrent major depression
with psychotic behavior."  (Docket Entry # 13-17, Tr. 1383).

     Plaintiff saw Madrid again on September 29, 2014 at Lowell
Community Health Center.  (Docket Entry # 13-24, Tr. 1959-61).
Plaintiff reported persistence of the same symptoms as in the
previous session.  Plaintiff additionally reported a prior
hospitalization in 2012 in Puerto Rico due to suicidal ideation
and incidents of intentionally burning himself with cigarettes.
(Docket Entry # 13-24, Tr. 1959-60).  Madrid opined that
plaintiff could "benefit from [i]ndividual therapy" to address
issues underlying his depression and help him develop coping
skills.  (Docket Entry # 13-24, Tr. 1960).  Madrid additionally
recommended medication to assist in stabilizing plaintiff's mood
and sleep patterns.  (Docket Entry # 13-24, Tr. 1960).  Overall,
Madrid assessed plaintiff's prognosis as good, given his insight
and strong familial support system.  (Docket Entry # 13-24, Tr.
1960).

     On October 7, 2014, plaintiff saw David Patterson, MS,
APRN,[9] NP ("Patterson") at Lowell Community Health Center.

---

[9]  An APRN is an advanced practice registered nurse who has
earned a graduate level degree in nursing and has been trained

(Docket Entry # 13-24, Tr. 1962-63).  Plaintiff complained of persistent feelings of depression, frequent crying episodes, and some suicidal thoughts.  (Docket Entry # 13-24, Tr. 1962). Patterson assessed plaintiff's mood as depressed and noted that his appearance was tearful during the visit.  (Docket Entry #13-24, Tr. 1962).  Patterson "[r]estarted plaintiff on reported medications."  (Docket Entry # 13-24, Tr. 1962-63).  Patterson also recommended that plaintiff continue therapy with Madrid. (Docket Entry # 13-24, Tr. 1963).

On November 10, 2014, plaintiff saw Madrid again at Lowell Community Health Center for continued therapy.  (Docket Entry # 13-31, Tr. 2090).  Plaintiff reported feeling better with the medication and noted that his ability to sleep had improved. (Docket Entry # 13-31, Tr. 2090).  Plaintiff reported feeling well enough to travel to see his son and grandchildren over the weekend.  (Docket Entry # 13-31, Tr. 2090).  Plaintiff also noted a marked decrease in suicidal thoughts and ideations. (Docket Entry # 13-31, Tr. 2090).  Plaintiff continued to attend regular therapy sessions with Madrid over the next six months. (Docket Entry # 13-31, Tr. 2036-84).

---

to perform one of the following specialized roles: certified nurse midwife, certified registered nurse anesthetist, clinical nurse specialist, or nurse practitioner ("NP").  Advanced Practice Registered Nurse (APRN), Registered Nursing (2019), https://www.registerednursing.org/aprn.

On November 11, 2014, state agency consultant Joseph A. Whitehorn, Ph.D ("Dr. Whitehorn") completed a psychiatric review technique form and a mental RFC at the reconsideration level. (Docket Entry # 13-6, Tr. 406-07, 409-11). Upon examining the record, Dr. Whitehorn concurred with Dr. Cohen's assessment that plaintiff's affective and anxiety related disorders mildly restrict plaintiff's social functioning and ability to partake in activities of daily living, and moderately restrict his ability to maintain concentration, persistence, or pace. (Docket Entry # 13-6, Tr. 362, 407). Dr. Whitehorn also offered an assessment of plaintiff's sustained concentration and persistence limitations identical to that of Dr. Cohen. (Docket Entry # 13-6, Tr. 365-66, 410-11). The only area in which Dr. Whitehorn's opinion differed from Dr. Cohen's was with regard to plaintiff's adaptational limitations. (Docket Entry # 13-6, Tr. 365, 410-11). Dr. Whitehorn found that plaintiff is moderately limited in his ability to respond appropriately to changes in work setting, clarifying that plaintiff remains capable of responding to changes in simple work routines. (Docket Entry # 13-6, Tr. 410-11).

Dr. Whitehorn further opined that while the new data from Lowell Community Health Center suggested an "upsurge of dramatic depressive [symptoms]," plaintiff's credibility as to his reported symptoms was lacking. (Docket Entry # 13-6, Tr. 411).

Dr. Whitehorn specifically noted that while at his appointments
at Lowell Community Health Center plaintiff claimed to have been
experiencing auditory and visual hallucinations for the past six
months, plaintiff had explicitly denied experiencing any such
symptoms in his evaluations with medical "contacts" (Dr. Morocco
and Dr. Husson) that took place within the same time frame.
(Docket Entry # 13-6, Tr. 411).

On May 12, 2015, plaintiff saw Martha Root, PMHNP-BC[10]
("Root") at Lowell Community Health Center for medication
management.  (Docket Entry # 13-31, Tr. 2037).  Plaintiff
reported feeling "tense with stress and depression," but
informed Root that he tries to manage these feelings by keeping
"busy doing word searches and listening to music."  (Docket
Entry # 13-31, Tr. 2037).  Plaintiff further reported some
hallucinations and paranoia five to nine months prior, but noted
that he had not experienced either of these symptoms recently.
(Docket Entry # 13-31, Tr. 2037).

On June 5, 2015, plaintiff saw Madrid and reported that his
mother had recently been hospitalized for health issues in
Puerto Rico.  (Docket Entry # 13-31, Tr. 2033).  Though

---

[10]  A psychiatric-mental health nurse practitioner ("PMHNP-BC")
is an APRN who has specialized in psychiatric – mental health.
See Alphabet Soup: LPN, RN, APRN, NP - Making Sense of Nursing
Roles & Scope of Practice, Nurse Practitioner Schools (2019),
https://www.nursepractitionerschools.com/blog/nursing-roles-by-
scope-of-practice/.

plaintiff reported feeling stressed, he noted that he had been able to manage his stress in positive ways by keeping in close contact with family and using techniques he had learned in therapy. (Docket Entry # 13-31, Tr. 2033). Plaintiff further reported his intention to travel to Puerto Rico to visit his wife and mother "from July to [the] end of August." (Docket Entry # 13-31, Tr. 2033). At subsequent appointments in late June and early July, Madrid and Root noted that plaintiff's mood continued to improve, and he continued to exhibit intact memory and fair judgment. (Docket Entry # 13-31, Tr. 2028-30).

On November 24, 2015, plaintiff saw Madrid for mental health counseling at Lowell Community Health Center. (Docket Entry # 13-31, Tr. 2018). Plaintiff reported feeling happy and excited about having recently moved out of his brother's home and into his own apartment. (Docket Entry # 13-31, Tr. 2018). Madrid noted that control over plaintiff's depression had improved and that his control over fleeting suicidal thoughts was much improved with medication. (Docket Entry # 13-31, Tr. 2018). At a December 11, 2015 appointment with Root, plaintiff similarly noted an improved mood. (Docket Entry # 13-31, Tr. 2011).

At a January 20, 2016 appointment with Root, plaintiff reported increased sadness and suicidal thoughts. (Docket Entry # 13-31, Tr. 2005). In response, Root adjusted the dosage of

33

plaintiff's medications.  (Docket Entry # 13-31, Tr. 2005).  At
a follow-up appointment with Madrid on January 25, 2016,
plaintiff reported improvement in his anxiety and ability to
manage suicidal thoughts after the increase in his medication
dosage.  (Docket Entry # 13-31, Tr. 2004).

On March 7, 2016, plaintiff saw Madrid for mental health
counseling at Lowell Community Health Center.  (Docket Entry #
13-31, Tr. 1993).  Plaintiff reported stress and anxiety caused
by his mother's recent hospitalization and his brother's ongoing
health problems.  (Docket Entry # 13-31, Tr. 1993).  Madrid
discussed coping strategies with plaintiff, and he agreed to try
to focus on positive thoughts and use relaxation and breathing
techniques to better manage his anxiety.  (Docket Entry # 13-31,
Tr. 1993).

On March 22, 2016, plaintiff saw Root at Lowell Community
Health Center for a follow-up appointment regarding his
medication.  (Docket Entry # 13-24, Tr. 1965-66).  Plaintiff
reported feeling "pretty good" on the medication, and Root
observed that plaintiff's affect was congruent and his memory
was intact.  (Docket Entry # 13-24, Tr. 1965-66).

On April 14, 2016, Madrid and Dr. Neelam Sihag, M.D. ("Dr.
Sihag") co-signed a "Mental Impairment Questionnaire" in which
they diagnosed plaintiff with schizoaffective disorder,
depressive type, and expressed the opinion that plaintiff is

34

"unable to meet competitive standards" in almost every category of mental ability needed to complete unskilled work.[11] (Docket Entry # 13-30, Tr. 1973-79). They further suggested that plaintiff is "[s]eriously limited, but not precluded" in his ability to understand, remember, and carry out short and simple instructions, and has marked difficulties in social functioning and maintaining concentration, persistence, and pace. (Docket Entry # 13-31, Tr. 1976, 1978). Various therapy notes by Madrid and Root reference the schizoaffective disorder assessment whereas others by Madrid reference the major depressive disorder. (Docket Entry ## 13-24, 13-31, Tr. 1960, 1966, 1980-2113).

III.  ALJ Hearing

As previously noted, plaintiff and a VE testified at the April 29, 2016 hearing before the ALJ. (Docket Entry # 13-5, Tr. 294-338). Plaintiff testified that he last worked as plumber's assistant for a company that performed maintenance work at Hospital San Lucas in Puerto Rico. (Docket Entry # 13-5, Tr. 310). Plaintiff stated that his responsibilities as a plumber's assistant primarily consisted of handling tools,

---

[11]  The questionnaire specifies that "[u]nable to meet competitive standards" means that the plaintiff "cannot satisfactorily perform" the activity "independently, appropriately, effectively and on a sustained basis in a regular work setting." (Docket Entry # 13-30, Tr. 1976).

cutting pipes, and sometimes painting.  (Docket Entry # 13-5,
Tr. 310).  Plaintiff estimated that the heaviest object he
carried in his role as a plumber's assistant was a sink faucet
that weighed approximately two pounds.  (Docket Entry # 13-5,
Tr. 310).  Plaintiff reported that prior to his job as a
plumber's assistant, he worked as an auto parts salesman at
Western Auto in Puerto Rico for approximately seven to eight
years.  (Docket Entry # 13-5, Tr. 308-309).  Plaintiff explained
that he worked behind the counter as a salesperson and also
helped to stock the shelves.  (Docket Entry # 13-5, Tr. 308-
309).  Plaintiff estimated that the heaviest object he lifted in
his capacity as a salesperson was a car starter weighing
anywhere between five and 15 pounds.  (Docket Entry # 13-5, Tr.
308-309).

     Plaintiff identified his physical impairments as including
diabetes, diabetic neuropathy and chronic pain, and blisters,
i.e. ulcers, in both his upper and lower extremities.  (Docket
Entry # 13-5, Tr. 311-12, 314-15).  Plaintiff explained that his
diabetes went uncontrolled for some time, which resulted in
nerve damage to his legs.  (Docket Entry # 13-5, Tr. 311).
Plaintiff stated that his legs are prone to swelling and that
some days he struggles to get out of bed.  (Docket Entry # 13-5,
Tr. 311).  Plaintiff explained that the pain is constant and
radiates up and down his legs.  (Docket Entry # 13-5, Tr. 315-

36

16).  Plaintiff noted that he also occasionally experiences
numbness in his legs.  (Docket Entry # 13-5, Tr. 316).  He
further testified that walking for more than five to ten minutes
at a time exacerbates the pain in his legs.  (Docket Entry # 13-
5, Tr. 316.).  He also noted that he suffers from chronic
blisters, i.e., ulcers.  (Docket Entry # 13-5, Tr. 318).
Plaintiff estimated that he gets new blisters [ulcers] on his
legs every 15 days or so, and noted that they can at times be
very painful.  (Docket Entry # 13-5, Tr. 318).  Plaintiff
explained that when he is at home, he tries to keep his feet and
legs elevated to minimize the discomfort from the blisters.
(Docket Entry # 13-5, Tr. 318).  Plaintiff further noted that he
can only remain seated for short periods of time due to pain in
his back.  (Docket Entry # 13-5, Tr. 317).  Plaintiff testified,
"I can sit for 40 or 50 minutes, but when I get up my back hurts
a lot."  (Docket Entry # 13-5, Tr. 317).

When questioned by the ALJ about why he continued to
struggle with his diabetes and compliance with treatment,
plaintiff testified that he continues to struggle to control his
diabetes and sometimes takes his morning dose of insulin late,
around 10:00 a.m., instead of at 8:00 a.m. as recommended by his
doctor.  (Docket Entry # 13-5, Tr. 312).  Plaintiff testified
that he used to smoke, but stopped in August 2015.  (Docket
Entry # 13-5, Tr. 313-14).  Plaintiff further explained that he

37

had recently begun to have problems with his left hand and
shoulder.  (Docket Entry # 13-5, Tr. 314).  He stated that he
cannot grip or lift things with his left hand, and that he
expected to begin physical therapy after his next medical
appointment.  (Docket Entry # 13-5, Tr. 314).  Plaintiff
elaborated that the fingers on his left hand are prone to
cramping and numbness.  (Docket Entry # 13-5, Tr. 317).
Plaintiff estimated that the most weight he could lift at the
time of the ALJ hearing was ten to 12 pounds.  (Docket Entry #
13-5, Tr. 317).

After describing his physical ailments, plaintiff began to
describe his psychological impairments.  (Docket Entry # 13-5,
Tr. 319).  Plaintiff testified that he was first diagnosed with
depression in 2010 after he was hospitalized for a failed
suicide attempt.  (Docket Entry # 13-5, Tr. 319-20).  Plaintiff
stated that he was not currently experiencing suicidal thoughts,
but that he has continued to suffer from other symptoms of
depression, such as crying spells, negative thoughts, and
feelings of wanting to run away.  (Docket Entry # 13-5, Tr. 320-
21).  Plaintiff testified that his depression makes him feel
tired and weak, and that he often feels like he wants to "sleep
and sleep and never get up." (Docket Entry # 13-5, Tr. 323).
Plaintiff also testified that he experiences auditory and visual
hallucinations several times per week, including seeing shadows

and hearing someone call his name or knock on his apartment
door.  (Docket Entry # 13-5, Tr. 321).  Plaintiff explained that
when he experiences these hallucinations, he tries to distract
himself by listening to music.  (Docket Entry # 13-5, Tr. 321).
Finally, plaintiff testified that he has trouble remembering
things and struggles with concentration.  (Docket Entry # 13-5,
Tr. 323).

After plaintiff, the VE then testified regarding
plaintiff's previous employment.  (Docket Entry # 13-5, Tr.
324).  The VE described plaintiff's work as an auto parts
salesperson, see DOT 279.357-062, and as a construction worker
one,[12] see DOT 869.664-014.  (Docket Entry # 13-5, Tr. 324-25).
The VE characterized the level of exertion for an auto parts
salesperson as "light" and described the work as "skilled."
(Docket Entry # 13-5, Tr. 324).  The VE characterized the level
of exertion of a construction worker as normally being "heavy,"
but "light work as performed" by plaintiff.  (Docket Entry # 13-
5, Tr. 325).  The VE described the position of a construction
worker as a semi-skilled job.  (Docket Entry # 13-5, Tr. 325-
26).

---

[12]  While the record reflects that plaintiff's actual job title
was plumber's assistant, the VE testified that this type of work
corresponds to construction work, which is functionally
equivalent to the type of work that plaintiff was performing as
a plumber's assistant.  (Docket Entry # 13-5, Tr. 310, 324).

Next, the ALJ posed the following hypothetical question to
the VE:

> [H]ere's an individual who can perform medium work.  So,
> [lifting] 50 pounds occasionally, 25 pounds frequently,
> stand, walk and sit six hours.  Frequently climb stairs
> and ramps.  Frequently stoop.  Occasionally climb ladders,
> ropes, and scaffolds.  Occasionally kneel, crouch, and
> crawl.  It's only physical limitations, so with those
> limitations, would the individual be able to do either of
> the claimant's past work?

(Docket Entry # 13-5, Tr. 326).  The VE responded in the
affirmative, noting that the work as an auto parts salesperson
as well as a construction worker one operating at the "light"
level would fit the hypothetical.  (Docket Entry # 13-5, Tr.
326).  The ALJ then asked the VE whether an individual typically
accumulates transferrable skills in either of those positions
that could translate to sedentary occupations.  (Docket Entry #
13-5, Tr. 326).  The VE again responded in the affirmative,
noting that there would be some "limited" transferrable skills
"considering the semi-skill[ed] or skill[ed] nature of the
work."  (Docket Entry # 13-5, Tr. 326).  The VE provided the
examples of "following spoken instructions, following written
instructions, handling customer complaints, [and] following
written work orders."  (Docket Entry # 13-5, Tr. 326).

The ALJ then adjusted the hypothetical and added that the
same individual is capable of "sustain[ing] focus and pace well
enough to complete simple instructions in an environment with

minor changes to tasks." (Docket Entry # 13-5, Tr. 327). The
ALJ proceeded to ask the VE whether, with the addition to the
hypothetical, the individual would be able to do the claimant's
past work. (Docket Entry # 13-5, Tr. 327). The VE responded
that the individual would not, as such an "individual would be
limited to unskilled work," while the claimant's past work was
performed at the skilled and semi-skilled levels. (Docket Entry
# 13-5, Tr. 327). The VE then identified jobs in the national
economy that such an individual could perform, such as laundry
worker one, see DOT 361.684-014, laundry worker two, see DOT
361.685-018, and storage laborer, see DOT 922.687-058. (Docket
Entry # 13-5, Tr. 328). The VE estimated that in the national
economy there are approximately 67,000 jobs available as a
laundry worker one, 198,000 jobs available as a laundry worker
two, and 22,000 jobs available as a storage laborer. (Docket
Entry # 13-5, Tr. 328).

The ALJ then posed a second hypothetical question to the
VE:

> Let's put out an individual who is limited to light work.
> So this individual can lift 20 pounds occasionally, 10
> pounds frequently. Sit, stand, or walk six hours per day.
> The individual can frequently push and pull with the left
> upper extremity. Occasionally climb stairs and ramps.
> Never climb ladders[,] ropes[,] and scaffolds.
> Occasionally balance, stoop, kneel, crouch[,] and crawl . .
> . Can frequently reach over head with the left upper
> extremity . . . Needs to avoid concentrated exposure to
> unprotected heights and machinery with external moving
> parts.

(Docket Entry # 13-5, Tr. 328). The VE testified that there
were jobs in the national economy that such an individual could
perform, such as marker two, see DOT 920.687-126, mail clerk,
see DOT 209.687-026, and school bus monitor, see DOT 372.667-
042. (Docket Entry # 13-5, Tr. 328-29). The VE estimated that
in the national economy there are approximately 26,000 jobs
available as a marker 2, 16,000 jobs available as a mail clerk,
and 96,000 jobs available as a school bus monitor. (Docket
Entry # 13-5, Tr. 328-29). The ALJ then asked the VE whether or
not the individual described in the second hypothetical would be
able to perform any of the claimant's past work. (Docket Entry
# 13-5, Tr. 329). The VE responded that the individual could
not perform the duties of a construction worker, but could
perform the work of an auto parts salesperson. (Docket Entry #
13-5, Tr. 329). The ALJ then modified the second hypothetical,
adding that the individual has to sit down to rest for four to
five minutes per hour due to chronic pain. (Docket Entry # 13-
5, Tr. 329-330). The ALJ then asked the VE whether, with the
modification, this individual could perform any of the
claimant's past work. (Docket Entry # 13-5, Tr. 330). The VE
responded in the affirmative, noting that as long as the total
amount of time that the individual was off task did not exceed
ten percent of the work day, the individual would probably be

able to perform the claimant's past work, dependent on the
particular employer. (Docket Entry # 13-5, Tr. 330).

Following the ALJ's questions, plaintiff's attorney began
to question the VE. (Docket Entry # 13-5, Tr. 330).
Plaintiff's attorney first asked the VE whether, if he were to
add non-English speaking as a factor to the first hypothetical,
the VE's testimony would change. (Docket Entry # 13-5, Tr.
331). The VE responded that it would largely depend on the
particular employer. (Docket Entry # 13-5, Tr. 331).
Plaintiff's attorney then asked whether the individual in first
hypothetical being a non-English speaker would alter the VE's
testimony as to the number of jobs available in the national
economy for such a person to perform. (Docket Entry # 13-5, Tr.
331). The VE responded that he could not give an exact number,
but that he would estimate that being a non-English speaker
would reduce the number of available jobs by three fourths.
(Docket Entry # 13-5, Tr. 332). The VE based this assessment
solely on his prior professional experience, and not on census
data or statistics from the Department of Labor. (Docket Entry
# 13-5, Tr. 333). With respect again to the first hypothetical,
plaintiff's attorney asked if lowering the frequent lifting from
25 pounds to 20 pounds would change the VE's testimony. (Docket
Entry # 13-5, Tr. 334). The VE testified that it would not.
(Docket Entry # 13-5, Tr. 334).

Plaintiff's attorney then modified the second hypothetical, adding that the individual is a non-English speaker and can only perform light, "sedentary and simple unskilled work." (Docket Entry # 13-5, Tr. 334). Plaintiff's attorney then asked the VE whether, with the new facts, he could identify any jobs that such an individual could perform that are available in the national economy. (Docket Entry # 13-5, Tr. 334). The VE identified surveillance system monitor, see DOT 379.367-010, table worker, see DOT 739.687-182, and assembler, see DOT 734.687-018, as jobs that such an individual could perform. (Docket Entry # 13-5, Tr. 334). The VE estimated that there are 14,000 jobs available as a surveillance system monitor, 23,000 jobs available as a table worker, and 206,000 jobs available as an assembler in the national economy. (Docket Entry # 13-5, Tr. 334). The VE noted that these numbers would be reduced by approximately 75% for a non-English speaker. (Docket Entry # 13-5, Tr. 334-35).

Plaintiff's attorney then further modified the hypothetical, specifying that individual could not reach overhead and was limited to "frequent fingering, handling, and grasping" with his upper extremities. (Docket Entry # 13-5, Tr. 335). Plaintiff's attorney then asked the VE whether, with the new facts, the individual could still perform any of the jobs that the VE had listed previously. (Docket Entry # 13-5, Tr.

44

335).  The VE responded that the individual would still be able
to perform the job functions of a surveillance system monitor
and a table worker.  (Docket Entry # 13-5, Tr. 335).
Plaintiff's attorney then asked whether, if the individual could
only occasionally finger, handle, and grasp objects, the VE's
testimony would change.  (Docket Entry # 13-5, Tr. 335).  The VE
responded that an individual who could only occasionally finger,
handle, and grasp objects could perform the duties of
surveillance system monitor, but not those of a table worker.
(Docket Entry # 13-5, Tr. 335).

DISCUSSION

I.   Jurisdiction and Standard of Review

     This court has the power to affirm, modify, or reverse the
ALJ's decision with or without remanding the case for a hearing.
42 U.S.C § 405(g).  Findings of fact by the ALJ are conclusive
if they are supported by substantial evidence.  See Richardson
v. Perales, 402 U.S. 389, 390 (1971); Seavey v. Barnhart, 276
F.3d 1, 9-10 (1st Cir. 2001); Manso-Pizarro v. Sec'y of Health
and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's
findings of fact are not conclusive if the ALJ has derived such
facts by "ignoring evidence, misapplying the law, or judging
matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35
(1st Cir. 1999).  It is the court's task to determine "whether
the final decision is supported by substantial evidence and

45

whether the correct legal standard was used." <u>Seavey v.</u>
<u>Barnhart</u>, 276 F.3d at 9.

Substantial evidence review is "more deferential than it
might sound to the lay ear: though certainly 'more than a
scintilla' of evidence is required to meet the benchmark, a
preponderance of evidence is not" required.  <u>Purdy v. Berryhill</u>,
887 F.3d 7, 13 (1st Cir. 2018) (quoting <u>Bath Iron Work Corp. v.</u>
<u>United States Dep't of Labor</u>, 336 F.3d 51, 56 (1st Cir. 2003))
(internal quotation marks omitted); <u>Bath Iron Work Corp. v.</u>
<u>United States Dep't of Labor</u>, 336 F.3d at 56 (the substantial
evidence standard "is notoriously difficult to overcome" and,
while "'more than a scintilla,' it *certainly* does not approach
the preponderance-of-the-evidence standard normally found in
civil cases") (emphasis added and internal citation omitted).
Thus, this court must affirm the ALJ's conclusion if it is
supported by substantial evidence, "even if the record arguably
could justify a different conclusion." <u>Rodriguez Pagan v. Sec'y</u>
<u>of Health and Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987);
<u>accord</u> <u>Musto v. Halter</u>, 135 F. Supp. 2d 220, 225 (D. Mass.
2001).

Substantial evidence exists where, "'reviewing the evidence
in the record as a whole,'" a reasonable mind "'could accept it
as adequate to support the Commissioner's conclusion.'" <u>Purdy</u>
<u>v. Berryhill</u>, 887 F.3d at 13 (quoting <u>Rodriguez v. Sec'y of</u>

Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

Finally, credibility issues are the "'prime responsibility'" of

the Commissioner, and conflicts in the evidence as well as the

"determination of the ultimate question of disability" are for

the Commissioner, "not for the doctors or for the courts," to

decide.  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d

at 222 (internal citation omitted).

II.  Disability Determination

        To receive SSI and disability insurance benefits, plaintiff

"must show that [he] had a disability" which began before or

during the period between the date of his application for

benefits and the date of the ALJ's decision and "which lasted or

was likely to last at least twelve months."  Johnson v. Colvin,

204 F. Supp. 3d 396, 401 (D. Mass. 2016).  The Social Security

Act defines a disability as the:

> [Inability] to engage in any substantial gainful activity
> by reason of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3); see 42 U.S.C. § 423(d)(1)(A).

Impairments must be of such a severity that the claimant is not

only unable to do his previous work but, in consideration of his

or her "age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 1382c(a)(3); see 42 U.S.C. §
423(d)(2)(A).

To determine whether a claimant is disabled within the
meaning of the statute, the ALJ applies a sequential, five-step
evaluation process and considers all of the evidence in the
record.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see
Goodermote v. Sec'y of Health and Human Servs., 690 F.2d 5, 6
(1st Cir. 1982).  At the first step, the claimant is not
disabled if he or she is currently employed.  See id.  If the
claimant is not employed, the ALJ proceeds to the second step to
evaluate whether or not the claimant has a severe impairment or
combination of impairments.  See id.  A severe impairment or
combination of impairments must meet a durational requirement of
"a continuous period of at least 12 months" and must
significantly limit the claimant's "physical or mental ability
to do basic work activities."  20 C.F.R §§ 404.1509,
404.1520(c), 416.909, 416.920(c).

If the claimant is not found to have a severe impairment or
combination of impairments, he or she is not disabled.  See
Goodermote v. Sec'y of Health and Human Servs., 690 F.2d at 6.
If the claimant has a severe impairment or combination of
impairments, then the analysis proceeds to the third step, in
which the ALJ must determine whether the claimant's severe
impairment or combination of impairments meets or is medically

equivalent to one of the impairments listed in Appendix 1,
Subpart P, Part 404 of the Code of Federal Regulations.  20
C.F.R. §§ 404.1520(d), 416.920(d); see Goodermote v. Sec'y of
Health and Human Servs., 690 F.2d at 6.  If the impairment or
combination of impairments meets or is medically equivalent to a
listed impairment, then the claimant is disabled.  If not, the
analysis proceeds to step four.  See id. at 6-7.

At step four, the ALJ must determine whether the claimant
is capable of performing any of his or her past relevant work by
comparing the claimant's current RFC with the mental and
physical demands of the claimant's past work.  See 20 C.F.R. §§
404.1520(a)(4), 404.1520(e), 916.920(a)(4), 916.920(e); Manso-
Pizarro v. Sec'y of Health and Human Servs., 76 F.3d at 17.  If
the claimant can perform any of his or her past relevant work,
the claimant is not disabled.  See Goodermote v. Sec'y of Health
and Human Servs., 690 F.2d at 7.  In the first four steps, the
burden to provide evidence and to prove an inability to perform
past work rests with the claimant.  See Manso-Pizzaro v. Sec'y
of Health and Human Servs., 76 F.3d at 17; Freeman v. Barnhart,
274 F.3d 606, 608 (1st Cir. 2001) ("applicant has the burden of
production and proof at the first four steps of the process").

If the claimant successfully satisfies his burden by
showing he can no longer perform his past work, the burden
shifts to the Commissioner to show the existence of other jobs

in the national economy that the claimant could perform.   20
C.F.R. §§ 404.1520(g), 416.920(g), 404.1560(c), 416.960(c);
Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Goodermote v.
Sec'y of Health and Human Servs., 690 F.2d at 7; Rosado v. Sec'y
of Health and Human Servs., 807 F.2d 292, 294 (1st Cir. 1986).
In making this determination at step five, the ALJ must consider
the claimant's RFC, age, education, and work experience.   20
C.F.R. §§ 404.1520(g), 416.920(g), 404.1560(c), 416.960(c).   The
claimant is not disabled if jobs that the claimant can perform
exist in significant numbers in the national economy.   20 C.F.R.
§§ 404.1560(c), 416.960(c), 404.1512(g), 416.912(g).

I.   ALJ's Decision

At step one of the five-step sequential evaluation process,
the ALJ found that plaintiff had "not engaged in substantial
gainful activity since January 25, 2013, the alleged onset date"
of plaintiff's disability.   (Docket Entry # 13-2, Tr. 17)
(emphasis omitted).   At step two, the ALJ found that plaintiff
had the following severe impairments:   "ischemic heart disease,
degenerative joint disease of the left shoulder, history of
patella-femoral chondromalacia, diabetic neuropathy, and
depressive disorders."   (Docket Entry # 13-2, Tr. 17) (emphasis
omitted).   The ALJ noted that while she was mindful of the fact
that plaintiff also suffers from uncontrolled diabetes,
"hypertension, dyslipidemia, high cholesterol, bursitis of the

right elbow, cellulitis, diabetic retinopathy, and scattered
degenerative changes" in his spine, the record failed to show
that any of these conditions, "considered singly or in
combination, have more than a minimal impact on the claimant's
ability to perform even minimal basic work-related tasks."
(Docket Entry # 13-2, Tr. 18).

At step three, the ALJ determined that plaintiff's
impairments did not meet or medically equal the severity of any
of the listed impairments in Appendix 1, Subpart P, Part 404 of
Title 20 of the Code of Federal Regulations. (Docket Entry #
13-2, Tr. 18). In making this determination, the ALJ first
considered whether plaintiff's physical impairments, considered
singly or in combination, met or medically equaled the criteria
for a listed impairment. (Docket Entry # 13-2, Tr. 18-19). The
ALJ noted that, "[t]here is no listing for diabetes. Pursuant
to SSR 14-2p, the claimant's diabetes mellitus Type II was
considered as a factor in meeting or equaling one of the
[l]istings." (Docket Entry # 13-2, Tr. 18). The ALJ ultimately
found that, "[e]ven accounting for this impairment, however, the
claimant fails to meet or equal the thresholds required by the
listings related to diabetes." (Docket Entry # 13-2, Tr. 18).
The ALJ likewise found that plaintiff's "ischemic heart disease,
degenerative joint disease of the left shoulder, history of
patella-femoral chondromalacia, and diabetic neuropathy" did not

51

meet or medically equal the criteria for a listed impairment.
(Docket Entry # 13-2, Tr. 19).

The ALJ then considered whether plaintiff's mental
impairments, considered singly or in combination, met or
medically equaled the criteria for a listed impairment.  (Docket
Entry # 13-2, Tr. 19).  In doing so, the ALJ considered whether
the "'paragraph B'" criteria had been satisfied, namely, whether
plaintiff's mental conditions had resulted in at least two of
the following:

> [M]arked restriction of activities of daily living; marked
> difficulties in maintaining social functioning; marked
> difficulties in maintaining concentration, persistence or
> pace; or repeated episodes of decompensation, each of
> extended duration.[13]

(Docket Entry # 13-2, Tr. 19).  First, with respect to
activities of daily living, the ALJ found that plaintiff had
only mild restrictions.  (Docket Entry # 13-2, Tr. 20).  The ALJ
noted that while plaintiff "complained of several issues in this
area," including "postural limitations" and difficulty walking
and standing, these constraints were attributable almost
entirely to plaintiff's physical conditions.  (Docket Entry #
13-2, Tr. 20).  With respect to plaintiff's mental conditions,

---

[13]  The ALJ clarified that a marked limitation is one that is
"more than moderate, but less than extreme," and that
"[r]epeated episodes of decompensation, each of extended
duration, means three episodes within one year, or an average of
once every four months, each lasting for at least two weeks."
(Docket Entry # 13-2, Tr. 19).

the ALJ noted that although plaintiff reported struggling with depression, "anxiety, decreased concentration, and some self-harm behaviors," the record reflected "grossly conservative mental health treatment with what appears to be a relatively stable prescription medication regimen." (Docket Entry # 13-2, Tr. 20). Citing the adult function reports completed by plaintiff, the ALJ further noted that even with this minimal mental health treatment, plaintiff reported being able to prepare meals, perform some household chores, "watch television, and maintain some semblance of daily routine." (Docket Entry # 13-2, Tr. 20). The ALJ opined that "[s]uch behavior, particularly in combination with the conservative treatment in the record, persuasively indicates that the claimant remains substantially capable in this area." (Docket Entry # 13-2, Tr. 20).

Second, with respect to social functioning, the ALJ found that plaintiff again had only mild difficulties. (Docket Entry # 13-2, Tr. 20). The ALJ again cited the relatively conservative mental health treatment plaintiff received, and noted that despite plaintiff's reported suicidal ideations, "the record at no time suggests that he exhibited any issues interacting normally with his various medical providers." (Docket Entry # 13-2, Tr. 20).

Third, with respect to concentration, persistence, and
pace, the ALJ found that plaintiff had moderate difficulties.
(Docket Entry # 13-2, Tr. 20).  The ALJ noted that despite
conservative treatment, the record reflected that plaintiff had
"consistently alleged general deficits in concentration and
distractibility."  (Docket Entry # 13-2, Tr. 20).  The ALJ
concluded that, "[c]rediting such consistent reports," plaintiff
was moderately limited in this area.  (Docket Entry # 13-2, Tr.
20).

Finally, with respect to repeated episodes of
decompensation, the ALJ found there was no evidence in the
record that plaintiff had experienced any such episodes as
defined in the regulations.  (Docket Entry # 13-2, Tr. 20).  The
ALJ concluded that because plaintiff's mental impairments had
not resulted in "at least two 'marked' limitations or one
'marked' limitation and 'repeated' episodes of decompensation,
each of extended duration," the "'paragraph B'" criteria had not
been satisfied.  (Docket Entry # 13-2, Tr. 21).  The ALJ further
considered whether the "'paragraph C'" criteria had been
satisfied, ultimately concluding they had not.  (Docket Entry #
13-2, Tr. 21).

In performing this analysis at step three, the ALJ gave
"significant weight" to the opinions of Dr. Cohen and Dr.
Whitehorn, the state agency psychological consultants at the

initial and reconsideration levels, both of whom assessed only

"mild restriction" in social function and activities of daily

living, and "moderate difficulties in concentration." (Docket

Entry # 13-2, Tr. 21). The ALJ explained that she did so for

several reasons: first, as state agency consultants, Drs. Cohen

and Whitehorn were "familiar with the disability program and its

evidentiary requirements"; and second, while neither

independently examined plaintiff, both were able to review the

majority of plaintiff's mental health treatment records,

including the consultative psychiatric examinations from 2014.

(Docket Entry # 13-2, Tr. 21).

Proceeding to step four, the ALJ found that plaintiff had

the RFC to perform light work as defined in 20 C.F.R. §§

404.1567(b), 416.967(b) as well as the following:

> [T]he claimant can frequently push, pull, and reach with
> the left upper extremity. The claimant can occasionally
> climb ramps and stairs, balance, stoop, kneel, crouch, and
> crawl. The claimant cannot climb ladders. The claimant
> must avoid concentrated exposure to hazards such as heights
> and dangerous, moving machinery. The claimant can also
> sustain focus and pace to complete simple instructions in
> environments with minor changes to tasks.

(Docket Entry # 13-2, Tr. 22) (emphasis omitted). In arriving

at the RFC, the ALJ made the following credibility finding:

> After careful consideration of the evidence, I find that
> claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms;
> however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these

> symptoms are not entirely consistent with the medical
> evidence and other evidence in the record[.]

(Docket Entry # 13-2, Tr. 23).  In making this finding, the ALJ
extensively examined plaintiff's physical and mental health
treatment records and ultimately determined that plaintiff's
claims of "disabling limitations" were "generally inconsistent
with the available medical evidence of record." (Docket Entry #
13-2, Tr. 29).  The ALJ noted that despite plaintiff's lengthy
history of physical and mental health complaints, the record
nonetheless reflected "largely intact physical, cognitive, and
emotional functioning" for the relevant period. (Docket Entry #
13-2, Tr. 29).  The ALJ further noted that plaintiff maintained
such stability with "broadly conservative set of physical and
mental health treatment," and emphasized that she was
"particularly mindful" that plaintiff's treating physicians had
not "recommended or prescribed more aggressive treatment
modalities such as surgical intervention or inpatient therapy."
(Docket Entry # 13-2, Tr. 29).  The ALJ also observed that,
"while not dispositive behavior," the record reflected "some
noncompliance with prescribed treatment, particularly, with
respect to [plaintiff's] diabetic neuropathy." (Docket Entry #
13-2, Tr. 29).  Finally, the ALJ pointed out that plaintiff
reported traveling for an extended period outside of the

contiguous United States to visit family.  (Docket Entry # 13, Tr. 29).

In her analysis at step four, the ALJ gave no probative weight to records of prior work excuses, reports that plaintiff was restricted to a first floor living area, and a prior finding by DTA that plaintiff was disabled.  (Docket Entry # 13-2, Tr. 23).  The ALJ explained that "the authors of these documents are not State agency consultants familiar with the disability program or its evidentiary requirements."  (Docket Entry # 13-2, Tr. 23).  Further, she explained that "the standards by which an individual may be found to be disabled" for the purposes of these documents "are not the same as those applied in the realm of disability benefits and are thus of highly limited relevance in this analysis."  (Docket Entry # 13-2, Tr. 23).  The ALJ further noted that plaintiff was previously assessed for the purposes of state-sponsored disability benefits.  (Docket Entry # 13-2, Tr. 23).  The ALJ emphasized that any findings of physical disability in these evaluations were "not based in the Social Security disability program" and were thus not binding on the ALJ.  (Docket Entry # 13-2, Tr. 23).  Nonetheless, the ALJ indicated that to the extent that portions of these evaluations suggested that plaintiff had "severe medical conditions resulting in some physical deficits," they were consistent with

the entirety of the record and were thus accorded "good weight."
(Docket Entry # 13-2, Tr. 23).

The ALJ considered the opinions proffered by Dr. Rosado
Villanueva and Dr. Saxena as "general observational evidence,"
noting that neither physician had proposed any specific
restrictions in plaintiff's "overall ability to perform even
minimal work activities." (Docket Entry # 13-2, Tr. 26). The
ALJ specifically noted that Dr. Saxena's note that plaintiff "is
incapable of standing for even ten to 15 minutes at a time" was
"highly inconsistent with the other medical evidence of record."
(Docket Entry # 13-2, Tr. 26). In particular, the ALJ pointed
to numerous medical findings in the record establishing that
plaintiff presented with a largely normal gait during the
relevant time period. (Docket Entry # 13-2, Tr. 27) (Docket
Entry # 13-14, Tr. 1075-97, 1137-72) (Docket Entry # 13-17, Tr.
1393-1443, 1449-54) (Docket Entry # 13-18, Tr. 1455-1524)
(Docket Entry # 13-24, Tr. 1920-54) (Docket Entry # 13-32, Tr.
2158).

The ALJ accorded "limited weight" to the opinions of state
agency physicians Dr. Arzola, Dr. McInerny, and Dr. Weeratne.
(Docket Entry # 13-2, Tr. 28). The ALJ explained that while all
three physicians were state agency consultants familiar with the
requirements of the disability program and had reviewed all
available medical evidence before them, their shared opinion

that plaintiff was capable of a medium exertional level of work

nonetheless "overexaggerate[s] the extent of the claimant's

actual physical capabilities." (Docket Entry # 13-2, Tr. 28-

29). In making such a finding, the ALJ emphasized the

following:

> [T]he assorted clinical examinations have repeatedly
> confirmed the presence of degenerative changes of the left
> shoulder, diabetic neuropathy, []ischemic heart disease,
> and his newly diagnosed condition of venous insufficiency.
> Such changes are further underscored by the claimant's
> overall history of various physical impairments as well.

(Docket Entry # 13-2, Tr. 29) (internal exhibit citations

omitted). The ALJ concluded that plaintiff was in fact "more

limited" than the medium level of work proposed by the state

agency physicians, and thus gave limited weight to their shared

opinions. (Docket Entry # 13-2, Tr. 29).

     With respect to plaintiff's mental functioning, the ALJ

gave "great weight" to the opinion of state agency consultant

Dr. Morocco. (Docket Entry # 13-2, Tr. 27). The ALJ cited Dr.

Morocco's familiarity with the disability program and the fact

that he had independently examined plaintiff as significant.

(Docket Entry # 13-2, Tr. 27). The ALJ further noted that Dr.

Morocco's finding that plaintiff was capable of following at

least simple instructions was "an accurate characterization of

the totality of the evidence of record" and cited plaintiff's

"stable and conservative mental health treatment" in support.

(Docket Entry # 13-2, Tr. 27).  The ALJ also cited the opinion
of Dr. Husson, another state agency consultant who offered an
opinion almost identical to that of Dr. Morocco.  (Docket Entry
# 13-2, Tr. 27).  Dr. Husson, like Dr. Morocco, opined that
plaintiff was capable of "following basic instructions and
interacting normally with others."  (Docket Entry # 13-2, Tr.
27).  The ALJ noted that Dr. Husson, like Dr. Morocco, "reviewed
all the evidence available at the time" and had personally
examined plaintiff.  (Docket Entry # 13-2, Tr. 27).

     The ALJ gave "little to no probative weight" to the opinion
offered by Dr. Sihag that plaintiff had "serious limitations in
meeting competitive standards" in almost all mental capacities,
and "marked limitations in social functioning and in maintaining
concentration."  (Docket Entry # 13-2, Tr. 28).  The ALJ
explained, first, that Dr. Sihag's conclusions were "not
supported by the totality of the evidence of record" and were in
fact "in sharp contrast with the other psychological examiners
and reviewers."  (Docket Entry # 13-2, Tr. 28).  Second, the ALJ
explained that even if Dr. Sihag's opinion was more current than
those of the other psychological reviewers and should therefore
reflect plaintiff's current mental status, "the extreme limits
opined" by Dr. Sihag "[were] not consistent with the current
medical records."  (Docket Entry # 13-2, Tr. 28).  Third, the
ALJ observed that the extent of the "treating relationship"

between plaintiff and Dr. Sihag was unclear, as the record
reflected only that plaintiff received counseling from Madrid
and medication management from Root.[14]  (Docket Entry # 13-2, p.
28).  Fourth, the ALJ noted that Dr. Sihag's assessment
"appear[ed] to be based primarily upon the claimant's subjective
perception[s]" of his physical and mental symptoms.  (Docket
Entry # 13-2, Tr. 28).  In support, the ALJ cited that fact
that, while Dr. Sihag described plaintiff as "hypervigilant" and
"'paranoid'" when feeling stressed, plaintiff "has also been
able to travel back and forth to Puerto Rico during the pendency
of the case with no evidence of needing assistance."  (Docket
Entry # 13-2, Tr. 28).  In essence, the ALJ noted that Dr.
Sihag's opinion was inconsistent with the reality of plaintiff's
travel to and from Puerto Rico.  (Docket Entry # 13-2, Tr. 28).

    Based on the medical record in its entirety, the ALJ
determined that plaintiff's physical and mental infirmities
"during the relevant period restrict[ed] him to a light
exertional level" including the "reaching, postural,
environmental, and mental limitations adopted in the residual
functional capacity."  (Docket Entry # 13-2, Tr. 29).  On the
basis of this RFC, the ALJ determined that plaintiff was unable

---

[14]  However, plaintiff did testify at the ALJ hearing that he was
seeing his psychiatrist, Dr. Sihag.  (Docket Entry # 13-5, Tr.
298).

to perform any of his past relevant work.  (Docket Entry # 13-2, Tr. 29).

Proceeding to step five, the ALJ assessed whether a significant number of jobs existed in the national economy that plaintiff could perform considering his "age, education, work experience, and [RFC]."  (Docket Entry # 13-2, Tr. 30) (emphasis omitted).  The ALJ cited the VE's testimony that an individual with plaintiff's limitations could perform other occupational duties, including those of a marker two, a mail clerk, and a school bus monitor.  (Docket Entry # 13-2, Tr. 31).  The ALJ additionally considered the testimony of the VE that the availability of such positions in the national economy would be reduced by up to 75 percent for non-English speakers.  (Docket Entry # 13-2, Tr. 31).  Nonetheless, the ALJ concluded that considering plaintiff's "age, education, work experience, and [RFC]," plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was thus "'not disabled'" within the meaning of the Social Security Act.  (Docket Entry # 13-2, Tr. 31).

IV.  Plaintiff's Arguments

In seeking to reverse or remand the decision of the Commissioner, plaintiff raises several arguments.  (Docket Entry ## 17, 20).  First, he argues that the ALJ improperly weighed the medical opinion evidence in her determination of the mental

RFC.  (Docket Entry ## 17, 20).  Second, he maintains that substantial evidence does not support the ALJ's finding that plaintiff is capable of sustaining or performing light work.[15] (Docket Entry ## 17, 20).

A.   Evaluation of Medical Opinion Evidence

Plaintiff submits that the ALJ erred in her evaluation of the medical opinion evidence used to determine the mental RFC, asserting that the ALJ improperly discredited the opinion of plaintiff's treating source and impermissibly relied on the opinions of the state agency consultants, which plaintiff contends were based on an incomplete review of the record. (Docket Entry # 17).  The Commissioner maintains that the ALJ appropriately weighed the medical opinion evidence in her determination of the mental RFC.  (Docket Entry # 19).  The Commissioner is correct.

1.   The ALJ's Decision Assigning "Little to No Probative Weight" to the Opinion Co-Signed by Dr. Sihag and Madrid Was Not Improper

Plaintiff asserts that the ALJ improperly discredited the opinion co-signed by Dr. Sihag, Madrid, and Root.[16]  (Docket

---

[15]  Plaintiff raises a number of additional arguments, which are addressed infra.
[16]  Plaintiff states that Madrid, Root, and Dr. Sihag completed the mental impairment questionnaire (Docket Entry # 17, p. 5) (referring to Tr. 1974-1978) when, in fact, Madrid and Dr. Sihag co-signed the questionnaire.  (Docket Entry # 13-30, Tr. 1973-1978).  The ALJ gave the opinion "[l]ittle to no probative weight."  (Docket Entry # 13-2, Tr. 28).

Entry # 17, p. 13).  Plaintiff argues that Dr. Sihag was a
"treating source" whose opinion should have been afforded
controlling weight given her unique familiarity with plaintiff's
"longitudinal treatment."  (Docket Entry # 17, p. 14).
Plaintiff further contends that the ALJ improperly rejected Dr.
Sihag's opinion because it was based on plaintiff's "'subjective
perceptions'" of his own symptoms, and suggests that the ALJ
erred in considering plaintiff's ability to travel in
determining what weight to afford Dr. Sihag's opinion.  (Docket
Entry # 17, p. 10) (emphasis omitted).  Plaintiff also maintains
that the ALJ erred in not re-contacting Dr. Sihag pursuant to 20
C.F.R. § 404.1520b(b)(2)(i).  (Docket Entry # 17, p. 14).

     An ALJ must "always consider the medical opinions in [the]
case record," and SSA regulations generally prefer the opinion
of a claimant's treating source over the opinion of a non-
examining source.  See 20 C.F.R. §§ 404.1527(c), 416.927(c).  A
treating source is an "acceptable medical source"[17] who "provides
[the claimant], or has provided [the claimant] with medical
treatment or evaluation and who has, or has had, an ongoing
treatment relationship with [the claimant]."  20 C.F.R. §§
404.1502, 416.902; see Gagnon v. Astrue, Civil Action No. 11-

---

[17]  The regulations define an acceptable medical source as, among
other things, a licensed physician or psychologist, or, for
claims filed on or after March 27, 2017, an advanced practice
registered nurse.  20 C.F.R. §§ 404.1502(a), 416.902.

10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012).  An
acceptable medical source who has no treating relationship with
the claimant does not "morph" into a treating source by affixing
his signature to an opinion or report completed by a non-
acceptable medical source[18] who *does* have a treating relationship
with the claimant.  See Resto v. Colvin, Civil Action No. 15-
30012-MGM, 2016 WL 1384779, at *5 (D. Mass. Apr. 7, 2016) (co-
signature of acceptable medical source who never examined or
otherwise treated claimant on an opinion by an "other" medical
source who had treated claimant did not transform the opinion
into a treating source opinion); see also Lobov v. Colvin, Civil
Action No. 12-40168-TSH, 2014 WL 3386567, at *14 n.8 (D. Mass.
June 23, 2014) (co-signature of acceptable medical source on an
opinion completed by a therapist, without any actual evaluation
of claimant, had no bearing on ALJ's discretion to disregard
therapist's opinion).

       Here, Madrid is neither an acceptable medical source nor a
treating source.  A therapist, such as Madrid, is not an
acceptable medical source, but rather an "other" health care

_____

[18]  The regulations draw a distinction between "acceptable
medical sources" and medical sources who are "other health care
providers," the latter referring to health care providers who do
not fall within the enumerated categories of "acceptable medical
sources," such as "(for example, nurse-practitioners . . . and
therapists)."  20 C.F.R. §§ 404.1502, 416.902, 404.1513(a), (d),
416.913(a), (d).

provider.   See 20 C.F.R. §§ 404.1502, 416.902.   As such, an ALJ
is afforded wide discretion in weighing a therapist's opinion
and "is only constrained by the duty to reach a conclusion
supported by substantial evidence in the record."  Gagnon v.
Astrue, 2012 WL 1065837, at *5.   Madrid is not a treating
source, but rather an "other" health care provider whose opinion
the ALJ was given wide latitude in weighing.   See 20 C.F.R. §§
404.1502, 416.902;[19] Gagnon v. Astrue, 2012 WL 1065837, at *5 ("A
treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as
a patient's own physician, psychologist, or other acceptable
medical source who has provided medical treatment in an ongoing
way.").   Turning to Root to complete the record, although an
APRN is currently considered an accepted medical source, this
applies only to claims filed on or after March 27, 2017.   See 20
C.F.R. § 404.1502(a)(7).   Plaintiff's claims were filed in early
2013 and the ALJ rendered her opinion in August 2016, and thus
for purposes of this action, Root is considered an "other"
medical source.   See 20 C.F.R. §§ 404.1502, 416.902.   Thus,
Root's assessments reciting a schizoaffective disorder are not a
treating source's opinion and the ALJ was free to consider them

---

[19]   As indicated, the above regulations at the relevant time
defined a "treating source" as the claimant's "own physician,
psychologist, or other acceptable medical source who provides
[the claimant] . . . with medical treatment or evaluation" and
has or had "an ongoing treatment relationship with [the
claimant]."  20 C.F.R. §§ 404.1502, 416.902.

in any way that she pleased, provided that her ultimate decision was supported by substantial evidence.  See 20 C.F.R. §§ 404.1502, 416.902; Gagnon v. Astrue, 2012 WL 1065837, at *5.

"[T]reating physicians' opinions are ordinarily accorded deference in Social Security disability proceedings," Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 n.9 (1st Cir. 2010), because such sources are more likely to offer "a detailed, longitudinal picture of [claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).  The opinion of a treating source is entitled to *controlling* weight with respect to the "nature and severity" of the claimant's impairments where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2); Purdy v. Berryhill, 887 F.3d at 13.

To determine the proper weight of a treating source opinion *not* assigned controlling weight, the ALJ considers the following factors:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the

67

treatment relationship; (3) the degree to which the opinion can
be supported by relevant evidence; (4) the treating source's
specialization; and (5) the consistency of the opinion "with the
record as a whole."  20 C.F.R. §§ 416.927(c)(2)-(6),
404.1527(c)(2)-(6); Bourinot v. Colvin, 95 F. Supp. 3d 161, 175-
76 (D. Mass. 2015) (noting that "[w]here controlling weight is
not given to a treating source opinion, the ALJ considers an
array of factors" and listings in 20 C.F.R. §§ 404.1527(c)(2)-
(6), 416.927(c)(2)-(6)).  Further, under the regulations, the
ALJ is required to provide an explanation for the weight given
to a treating source opinion and the reasoning supporting the
decision.  Santana v Colvin, Civil Action No. 15-13232-IT, 2016
WL 7428223 at *3 (D. Mass. Dec. 23, 2016) ("even when an ALJ
does provide reasons for discounting a treating source opinion,
remand is proper if those reasons are 'unpersuasive' or
'significantly flawed'") (quoting Johnson v. Astrue, 597 F.3d
409, 411-12 (1st Cir. 2009)).

     In the case at bar, the ALJ reasonably gave little to no
probative weight to the opinion co-signed by Dr. Sihag and
Madrid.  First, contrary to plaintiff's assertions, there is no
evidence in the record to suggest that Dr. Sihag had a treating
relationship with plaintiff or ever even examined plaintiff.  In
fact, the evidence in the record relating to Dr. Sihag consists
of her signature on the opinion co-signed by Madrid, who

68

plaintiff *did* see for therapy sessions.  (Docket Entry # 13-30,
Tr. 1973-79).  The signature page of the opinion in particular
seems to suggest that Dr. Sihag's role was supervisory, at
best.[20]  (Docket Entry # 13-30, Tr. 1979).  Absent evidence of a
prior treating relationship in an ongoing treatment
relationship, Dr. Sihag was not a treating physician for
purposes of the ALJ's analysis, see 20 C.F.R. §§ 404.1502,
404.1527(c), 416.902, 416.927(c); Gagnon v. Astrue, 2012 WL
1065837, at *5, and the ALJ's finding that the "extent of the
treating relationship" "is unclear" (Docket Entry # 13-2, Tr.
28) is supported by substantial evidence.  Second, the signature
of Dr. Sihag, an acceptable medical source under the
regulations, does not transform the opinion signed by Madrid, an
"other" medical source per the regulations, into a treating
source opinion.  See 20 C.F.R. §§ 404.1502, 404.1513, 916.902,
916.913; Resto v. Colvin, 2016 WL 1384779, at *5; Lobov v.
Colvin, 2014 WL 3386567, at *14 n.8.

Even assuming that Dr. Sihag had a treating relationship
with plaintiff, the ALJ properly considered the factors laid out
in the regulations and articulated sufficient reasons for the

---

[20]  The signature page of the opinion instructs "If you are not
an M.D. or licensed Psychologist, please have your report co-
signed by an individual who has that title," suggesting that Dr.
Sihag's signature on the opinion completed by Madrid was little
more than a formality.  (Docket Entry # 13-30, Tr. 1979).

weight afforded to the opinion.  See 20 C.F.R. §§
404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Plaintiff's assertion
that the ALJ rejected the opinion signed by Dr. Sihag and Madrid
on the basis of the ALJ's own assessment as a layman is patently
false.  To the contrary, the ALJ specifically articulated her
reasoning for denying the opinion controlling weight, stating
that she did so because (1) the extent and frequency of the
treating relationship was unclear, (2) the conclusions proffered
appeared to rely excessively on plaintiff's subjective
perceptions of his own symptoms, and (3) the opinion was
inconsistent with the other substantial evidence in the record.
(Docket Entry # 13-2, Tr. 28).

     Plaintiff shows no error by alleging that the ALJ
improperly discredited the opinion because it appeared to rely
on plaintiff's subjective perception of his own symptoms.  See
Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d at
3 (upholding ALJ's decision to discredit the opinions of two
treating physicians where he "reasonably concluded that they
relied excessively on claimant's subjective complaints, rather
than on objective medical findings"); Sanchez v. Berryhill,
Civil Action No. 18-30084-KAR, 2019 WL 2437265, at *12 (D. Mass.
June 10, 2019) ("'extent to which a treating source's opinion
evidence rests on a claimant's subjective, untested accounts of
her symptoms and limitations is a factor on which an ALJ is

70

entitled to rely in deciding what weight to accord to that
evidence'") (quoting DeCepeda v. Berryhill, Civil Action No. 17-
30080-KAR, 2018 WL 3748170, at *12 (D. Mass. Aug. 6, 2018)).

Further, there is ample evidence in the record to support
the ALJ's finding that the opinion that plaintiff was "[u]nable
to meet competitive standards" in almost every area of mental
functioning necessary for unskilled work was inconsistent with
the entirety of the medical record.  (Docket Entry # 13-30, Tr.
1973-79).  For example, the ALJ cited the opinions offered by
the examining state agency consultants, Drs. Morocco and Husson,
who both found that, despite some agitation and anxiety,
plaintiff remained capable of following short, simple
instructions.  (Docket Entry # 13-2, Tr. 27).  Furthermore, the
ALJ cited the underlying, longitudinal mental health treatment
records from Root and Madrid reflecting improvement in
plaintiff's depression, "logical thought process and content,"
intact insight and judgment, and "otherwise normal cognitive
functioning" as recently as March 2016, mere weeks before Dr.
Sihag and Madrid co-signed the opinion.  (Docket Entry # 13-2,
Tr. 26-28) (Docket Entry # 13-30, Tr. 1973-79).  The ALJ's
decision to afford little to no probative weight to the opinion
partially on this basis was thus not improper.  See Castro v.
Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (ALJ may
"reject a treating physician's opinion as controlling if it is

inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors.").

Plaintiff also shows no error by suggesting that it was improper for the ALJ to consider plaintiff's ability to travel when deciding what weight to afford the opinion of Dr. Sihag and Madrid and the assessments by Root.  The ALJ did not, as plaintiff suggests, equate an ability to travel with an ability to work.  Rather, the ALJ permissibly cited plaintiff's reported travel to Puerto Rico and New York as an example of evidence in the record inconsistent with the extreme limits to plaintiff's mental functioning opined by Dr. Sihag and Madrid.  See De Oliveira v. Colvin, Civil Action No. 14-12629-DJC, 2016 WL 3460313, at *10 (D. Mass. June 20, 2016) (inconsistency between claimant's ability to travel internationally and opinion finding that plaintiff had significant mental impairment was "good reason[]" for giving little weight to the opinion).  Plaintiff's reference to his hospitalization following his return from Puerto Rico is misleading.  Plaintiff was not hospitalized due to a mental health issue, but rather because of an ulcer on his leg that had become infected.  (Docket Entry # 13-21, Tr. 1711). The record therefore does not necessarily suggest that plaintiff's hospitalization was related to his travel.

Finally, plaintiff's contention that the ALJ was obligated to recontact Dr. Sihag,[21] pursuant to 20 C.F.R. § 404.1520b(b)(2)(i)[22] and 416.920b (Docket Entry # 17, p. 14) (Docket Entry # 20, p. 5) is misguided.  The regulation does not inevitably *require* the ALJ to recontact the treating source.  See 20 C.F.R. § 404.1520b(c)(2).  Rather, recontacting the treating source is but one of several options available to the ALJ in the event there is insufficient evidence to determine whether the claimant is disabled.  See 20 C.F.R. § 404.1520b(c)(2); Rackliff v. Berryhill, Civil Action No. 16-002050-JHR, 2017 WL 2266796, at *7 (D. Me. May 22, 2017) ("regulation does not require an administrative law judge to recontact a medical source; that is merely one of several

---

[21]  In making this argument, plaintiff assumes that Dr. Sihag was, in fact a treating source.  (Docket Entry # 17).  As discussed above, under the regulations, Dr. Sihag was *not* a treating source, nor was the opinion she co-signed with Madrid and Root a treating source opinion.  Nonetheless, for purposes of addressing plaintiff's argument, this court assumes, hypothetically, that Dr. Sihag was a treating source.
[22]  This subsection took effect on March 27, 2017, almost one year *after* the ALJ issued her decision in this case.  That said, it generally corresponds to the subsection of the regulation in effect when the ALJ issued her decision.  See 20 C.F.R. § 404.1520(b)(c)-(c)(1).  The latter subsection states, in pertinent part, that the ALJ "*may*" choose to recontact a "treating physician, psychologist, or other medical source" where "the evidence is consistent but we have insufficient evidence to determine whether [the claimant] [is] disabled" or where "after weighing the evidence . . . we cannot reach a conclusion about whether [the claimant] [is] disabled."  20 C.F.R. §§ 404.1520b(c)(2)-(2)(i) (emphasis added).

available options") (citing 20 C.F.R. § 416.920b(c)); Arrington
v. Colvin, 216 F. Supp. 3d 217, 243 (D. Mass. 2016) (noting that
ALJ had "option of seeking additional information from a number
of different sources, and would not have been required to re-
contact Dr. Kelman"), aff'd sub nom. Arrington v. Berryhill, No.
17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018); accord Dooley
v. Comm'r of Soc. Sec., 656 F. App'x 113, 123 (6th Cir. 2016)
(recognizing that "ALJ may contact a medical source for further
clarification when the record contains insufficient evidence"
for ALJ to determine "whether the claimant is disabled" but not
requiring recontact because "ALJ's thorough opinion demonstrates
that he carefully considered the entire record, including Dr.
Yates's opinion, . . . before determining" record contained
sufficient evidence to conclude claimant "was not disabled")
(citing 20 C.F.R. § 404.1520b(c)(1)) (unpublished).  In the case
at bar, the ALJ did not indicate that there was insufficient
evidence in the record from which to determine whether plaintiff
was disabled.  On the contrary, the ALJ found and summarized
ample evidence supporting her conclusion that plaintiff was not
disabled.  The ALJ thus did not err in failing to recontact Dr.
Sihag.  See Rackliff v. Berryhill, 2017 WL 2266796, at *6 (ALJ
did not err in not recontacting a treating source where ALJ did
not indicate a lack of sufficient evidence to make a disability
determination); Arrington v. Colvin, 216 F. Supp. 3d at 243 (ALJ

"was able to weigh the available evidence and reach a
determination about Arrington's disability claim without the
need to obtain additional information" and was therefore not
required to recontact treating source) (discussing 20 C.F.R. §
404.1520b(c)).

2. <u>ALJ's Assignment of Weight to Opinions of State Agency
Consultants Not Improper</u>

Plaintiff further challenges the ALJ's decision to assign
significant weight to the opinions of the consultative mental
health examiners on the grounds that their opinions were based
on an incomplete review of the record.  (Docket Entry # 17, p.
10).  Plaintiff notes that Drs. Morocco, Husson, Cohen, and
Whitehorn were "lacking all but one" of plaintiff's behavioral
health treatment notes from Lowell Community Health Center at
the time they completed their evaluations.  (Docket Entry # 17,
p. 10).  Plaintiff submits that the ALJ was "plainly wrong" in
stating that they were able to review the bulk of plaintiff's
mental health treatment records and contends that the ALJ erred
in relying on their opinions when no medical expert had reviewed
and offered an opinion based on the entirety of the record.
(Docket Entry # 17, p. 10).  Plaintiff further contends that in
doing so, the ALJ improperly substituted her own judgment for
that of a medical expert.  (Docket Entry # 17, p. 13).
Plaintiff further suggests that the ALJ did not in fact give

"great weight" to the portion of Dr. Morocco's opinion in which
he observed that plaintiff was "'agitated and nervous.'"
(Docket Entry # 17, p. 7).

An ALJ may assign weight to the opinions of state agency
medical and psychological consultants "only insofar as they are
supported by evidence in the case record."  SSR 96-6p, 1996 WL
374180, at *2 (July 2, 1996).  The ALJ is ultimately only
required to "make a decision that is supported by substantial
evidence," and thus if the ALJ "comes to a conclusion contrary
to that of the treating physician and alternatively adopts the
opinion of a non-examining source," this court must uphold the
decision as long as a "'reasonable mind'" could find the record
as a whole adequately supports this conclusion.  Johnson v.
Colvin, 204 F. Supp. 3d at 410 (internal citation omitted).
"[T]he fact that a State agency consultant 'did not have access
to all of the records . . . does not prevent the ALJ from
assigning significant weight to [the consultant's] assessment if
the ALJ conducted an independent review of the evidence, which
included treatment notes [that] the consultant had not
considered.'"  Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 137
(D. Mass. 2014) (quoting Carter v. Astrue, 866 F. Supp. 2d 1093,
1112 (N.D. Iowa 2012)); accord Genereux v. Berryhill, Civil
Action No. 15-13227-GAO, 2017 WL 1202645, at *5 (D. Mass. Mar.
31, 2017) ("there was no reversible error in relying, in part,

on the [consultants'] opinions, which the ALJ found to be supported by other evidence in the record, even though those opinions were issued based on a partially incomplete evidence record"). Furthermore, the ALJ may rely on the opinion of a consultative medical examiner even when the examiner did not have the benefit of reviewing subsequent treatment records where the opinion proffered remains consistent with the record as a whole. See Abubakar v. Astrue, Civil Action No. 11-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012) ("ALJ may rely on older evidence when the information in that evidence remains accurate").

While it is true that additional evidence in the form of behavioral treatment notes from Lowell Community Health Center were added to the record after the completion of the state agency opinions in this case, this court nonetheless finds no reversible error in the ALJ's reliance on the above-noted opinions. In granting "significant weight" to the opinions of Drs. Cohen and Whitehorn, the ALJ emphasized that, having examined the entirety of the record, including the treatment notes post-dating the consultative opinions, she found their conclusions to be "accurate representation[s] of the entirety of the medical evidence of record." (Docket Entry # 13-2, Tr. 21). The record supports the finding. (Docket Entry # 13-2, Tr. 21) (Docket Entry # 13-5, Tr. 330-338), (Docket Entry # 13-6, Tr.

339-437) (Docket Entry # 13-17, Tr. 1382-85) (Docket Entry # 13-24, Tr. 1959-61, 1965-66) (Docket Entry # 13-31, Tr. 1965, 1993, 1996-97, 2001, 2004, 2011, 2015, 2018, 2028, 2030, 2040, 2084, 2090).

Likewise, in affording "great weight" to the opinions of Drs. Morocco and Husson, both of whom had been able to examine plaintiff, the ALJ emphasized that the opinions were "accurate characterization[s] of the totality of the evidence of record, including [that] made available at the hearing level." (Docket Entry # 13-2, Tr. 27). With respect to the underlying evidence of record, the ALJ specifically cited, in Morocco and Husson, the underlying treatment notes documenting intact memory, insight, and judgment as well as admitted improvements in plaintiff's depression and overall mental health as recently as March 2016. The ALJ also permissibly considered plaintiff's relatively conservative treatment and medication regime. See Genereux v. Berryhill, 2017 WL 1202645, at *4 (upholding ALJ's decision to afford "'some weight'" to opinion of consultative examiner because opinion was supported by substantial evidence in record, including evidence of claimant's conservative treatment plan) (internal citation omitted). The ALJ thus did not err in affording "significant weight" to the opinions of Drs. Cohen and Whitehorn, and "great weight" to the opinions of Drs. Morocco and Husson, because these opinions were supported

78

by substantial evidence in the record.  See Genereux v.
Berryhill, 2017 WL 1202645, at *4-5; Martinez-Lopez v. Colvin,
54 F. Supp. 3d at 137; Abubakar v. Astrue, 2012 WL 957623, at
*12.

In crediting the opinions of the state agency consultants,
the ALJ did not, as plaintiff suggests, substitute her own
judgment for that of a medical expert, nor was the ALJ required
to seek additional medical expert testimony as to the entirety
of plaintiff's mental health record.  Ivins v. Colvin, Civil
Action No. 12-11460-TSH, 2013 WL 6072890, at *10 (D. Mass. Nov.
15, 2013) ("ALJ was not required to seek additional expert
medical advice, as there was substantial medical evidence on the
record") (citing Rodriguez Pagan v. Sec'y of Health and Human
Servs., 819 F.2d at 5); see also Evangelista v. Sec'y of Health
and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) ("notion
that there must always be some super-evaluator, a single
physician who gives the factfinder an overview of the entire
case-is unsupported by the statutory scheme, or by the caselaw,
or by common sense, for that matter").  Plaintiff's claim that
the ALJ did not afford "great weight" to the portion of Dr.
Morocco's observations that plaintiff appeared "agitated and
nervous" is equally misguided.  In summarizing the opinion of
Dr. Morocco, the ALJ referenced plaintiff's "reported history of
depressive and anxious feelings," and acknowledged that Morocco

diagnosed plaintiff with anxious distress.  (Docket Entry # 13-
2, Tr. 27).  Moreover, Dr. Morocco's observation that plaintiff
appeared agitated during the consultative exam was not an
opinion as to plaintiff's ability to work, and the ALJ properly
cited substantial evidence, both from Dr. Morocco as well as
other sources in the record supporting the adoption of the
mental RFC.  See Kiklis v. Astrue, Civil Action No. 10-10699-
NMG, 2011 WL 4768491, at *7 (D. Mass. Sept. 28, 2011) ("The ALJ
need not address every medical observation as long as
substantial evidence in the records supports his decision.").
Specifically, in finding that Dr. Morocco's conclusion that
plaintiff "is capable of following at least simple instructions"
to be an accurate representation of the medical record as a
whole, the ALJ pointed to "the generally stable and conservative
mental health treatment, the claimant's admitted improvements as
recently as February and March 2016, and his reliably normal
interactions with assorted medical professionals."  (Docket
Entry # 13-2, Tr. 27) (Docket Entry # 13-14, Tr. 1075-97, 1137-
72) (Docket Entry # 13-17, Tr. 1382-89) (Docket Entry # 13-24,
Tr. 1955-67) (Docket Entry # 13-32, Tr. 2122-78).  Plaintiff
thus shows no error in asserting that the ALJ discounted a
single observation by Dr. Morocco, when substantial evidence
supported the overall RFC determination.  See Sullivan v.
Colvin, Civil Action No. 14-13772-LTS, 2015 WL 5613163 at *5 (D.

Mass. Sept. 24, 2015) ("[p]ointing to one piece of evidence in
the administrative record that might support a different RFC
determination cannot successfully demonstrate that the ALJ did
not rely upon substantial evidence in his assessment").

B.   Substantial Evidence Supports ALJ's RFC Determination

Plaintiff additionally contends that the ALJ's finding that
plaintiff is capable of performing light work was not supported
by substantial evidence.  (Docket Entry ## 17, 20).
Specifically, he alleges that the ALJ failed to properly
consider evidence of plaintiff's uncontrolled diabetes and its
comorbidities, improperly relied on evidence of plaintiff's
activities of daily living in determining whether plaintiff was
disabled, and did not account for plaintiff's loss of
concentration in the RFC that she ultimately adopted.  (Docket
Entry ## 17, 20).  The Commissioner maintains that the ALJ
properly considered all of the evidence before her and that the
ultimate RFC determination was supported by substantial
evidence.  (Docket Entry # 19).  The Commissioner is correct.

1.   Evaluation of Diabetes Related Evidence

With respect to plaintiff's diabetes, plaintiff first
argues that the ALJ erred in declining to consider plaintiff's
diabetes a severe impairment at step two in the analysis.
(Docket Entry # 17, p. 17).  Plaintiff maintains that the ALJ
failed to consider plaintiff's uncontrolled diabetes in

conjunction with plaintiff's other impairments in her analysis
at steps two, three, and four in violation of SSR 14-2p.[23]
(Docket Entry ## 17, 20).  Plaintiff further alleges that the
ALJ ignored evidence of plaintiff's diabetic retinopathy and
discounted plaintiff's complaints of pain in his extremities in
her calculation of the RFC.  (Docket Entry ## 17, 20).
Plaintiff is incorrect on all counts.

In her decision, the ALJ explained that while at step two
she found plaintiff's diabetic neuropathy to be "severe,"
plaintiff's uncontrolled diabetes and its co-morbidities,
*including* diabetic retinopathy, were not severe, because "the
record fails to show that any of the aforementioned conditions,
*considered singly or in combination*, have more than a minimal
impact on the claimant's ability to perform even minimal basic
work related tasks."  (Docket Entry # 13-2, Tr. 18) (emphasis
added).  Although plaintiff contests this finding, it is
ultimately inconsequential, as "[a]ny error at step two of the
sequential analysis is harmless where the evaluation proceeds
past step two and [the ALJ] considers all of the claimant's
impairments at step four."  Jones v. Colvin, Civil Action No.

---

[23] This regulation, in pertinent part, requires the ALJ to
assess a claimant's diabetes both individually as well as in
conjunction with other impairments in the analysis at steps two,
three, and four.  See SSR 14-2p, 2014 WL 2472008, at *6-7 (June
2, 2014).

12-40061-TSH, 2014 WL 575457, at *12 (D. Mass. Feb. 10, 2014)
(citing Noel v. Astrue, Civil Action No. 11-30037-MAP, 2012 WL
2862141 (D. Mass. July 10, 2012)).  The ALJ in this case did
exactly that by proceeding to step four of the analysis and
considering all of plaintiff's impairments, both severe and non-
severe, in assessing the RFC.  (Docket Entry # 13-2, Tr. 22-29).

Plaintiff's reliance on SSR 14-2p similarly shows no error
on the part of the ALJ.  At step two, the ALJ emphasized that
plaintiff's impairment "*considered singly or in combination*" did
not "have more than a minimal impact on the claimant's ability
to perform even minimal basic work-related tasks."  (Docket
Entry # 13-2, Tr. 18) (emphasis added).  Likewise, at step
three, the ALJ noted that while no listing existed for diabetes,
plaintiff's uncontrolled diabetes "was considered as a factor in
meeting or equaling one of the [l]istings." (Docket Entry # 13-
2, Tr. 18).  Finally, at step four, the ALJ cited plaintiff's
history of uncontrolled diabetes and subsequent complaints of
pain resulting from diabetic neuropathy, in combination with
plaintiff's other demonstrated impairments, in support of the
ALJ's ultimate finding that plaintiff had *greater* physical
limitations than suggested by the state agency physicians, Drs.
Arzola, McInerny, and Weeratne.  (Docket Entry # 13-2, Tr. 29).
Plaintiff is thus incorrect when he states that the ALJ failed
to consider his history of diabetes in conjunction with his

83

other physical impairments.  Additionally, plaintiff does not
identify any specifically procedural violations on the part of
the ALJ or point to any specific evidence that the ALJ failed to
include in her analysis.

Plaintiff's suggestion that the ALJ discounted plaintiff's
subjective complaints of pain in his extremities in her analysis
at step four is equally misguided.  While the ALJ did note
"essentially normal findings on physical examination" in 2013,
she also noted "confirmed evidence of right lower extremity
axonal sensory polyneuropathy" in January 2014, as well as
complaints of upper and lower extremity pain attributable to
diabetic neuropathy in May 2014.  (Docket Entry # 13-2, Tr. 24,
26).  Furthermore, as discussed above, the ALJ ultimately
assessed *greater* physical limitations than suggested by the
state agency physicians, Drs. Arzola, McInerny and Weeratne,
finding "[their] shared opinion suggesting that the claimant is
capable of a medium exertional level of work to over-exaggerate
the extent of claimant's actual physical capabilities." (Docket
Entry # 13-2, Tr. 29).  In making this finding, the ALJ
specifically pointed to the fact that "assorted clinical
examinations have repeatedly confirmed the presence of
degenerative changes of the left shoulder, diabetic neuropathy .
. . ischemic heart disease, and [the] newly diagnosed condition
of venous insufficiency." (Docket Entry # 13-2, Tr. 29).

Plaintiff has not produced any evidence suggesting greater
limitations than those ultimately adopted by the ALJ in her RFC
assessment, and thus has not "'demonstrate[d] that the evidence
relied on by the ALJ is either insufficient [or] incorrect.'"
Blais-Peck v. Colvin, Civil Action No. 14-30084-KAR, 2015 WL
4692456, at *6 (D. Mass. Aug. 6, 2015) (quoting Greene v.
Astrue, Civil Action No. 11-30084-KPN, 2012 WL 1248977, at *3
(D. Mass. Apr. 12, 2012)).  Remand on this basis would thus be
improper.  See Ortiz v. Colvin, Civil Action No. 13-12793-DPW,
2015 WL 4577106, at *8 (D. Mass. July 30, 2015) (remand improper
where ALJ found greater limitations than those set forth in
state agency reports because "[t]here is no reversible error
when an ALJ gives a claimant the benefit of the doubt").

    Plaintiff further contends that the ALJ improperly weighed
the evidence of plaintiff's noncompliance with treatment of his
diabetes and its co-morbidities.  (Docket Entry ## 17, 20).
Specifically, plaintiff alleges that the ALJ failed to make
clear the role that plaintiff's noncompliance with treatment had
in her ultimate determination that plaintiff was not disabled.
(Docket Entry ## 17, 20).  Plaintiff also maintains that SSR 16-
3p required the ALJ to consider whether plaintiff's
noncompliance with treatment was the result of mental illness,
and that the ALJ failed to fulfill this obligation.  (Docket
Entry ## 17, 20).

Under the regulations:

> [I]f the frequency or extent of the treatment sought by an
> individual is not comparable with the degree of the
> individual's subjective complaints, or if the individual
> fails to follow prescribed treatment that might improve
> symptoms, we may find the alleged intensity and persistence
> of an individual's symptoms are inconsistent with the
> overall evidence of record.

SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017); see also

Balaguer v. Astrue, 880 F.Supp.2d 258, 269 (D. Mass. 2012) ("'A

claimant's failure to follow prescribed medical treatment

contradicts subjective complaints of disabling conditions and

supports [a hearing officer's] decision to deny benefits.'")

(quoting Russell v. Barnhart, 111 Fed. App'x 26, 27 (1st Cir.

2004)).  Furthermore, the regulation specifies that the ALJ will

not find the alleged intensity and persistence of an

individual's symptoms inconsistent with the overall record on

this basis "without considering possible reasons he or she may

not comply with treatment" and that the ALJ "may need to contact

the individual regarding the lack of treatment or, at an

administrative proceeding, ask why he or she has not complied

with or sought treatment in a manner consistent with his or her

complaints."  SSR 16-3p, 2017 WL 5180304, at *9 (bold typeface

omitted).

In the case at bar, the ALJ, contrary to plaintiff's

assertions, did explain the role that plaintiff's noncompliance

with his diabetes treatment had on her ultimate finding that

plaintiff was not disabled.  The ALJ specified that while not
dispositive, plaintiff's noncompliance with prescribed treatment
was one of several reasons that the ALJ found plaintiff's
"allegations of disabling limitations" generally inconsistent
with the entirety of the medical record.  (Docket Entry # 13-2,
Tr. 29).  Furthermore, plaintiff is mistaken when he suggests
that the ALJ did not consider potential reasons for plaintiff's
noncompliance with treatment.  The ALJ, in accordance with the
regulations, asked plaintiff at the hearing why he continued to
struggle with his diabetes and what the reasons were for his
noncompliance with treatment.  (Docket Entry # 13-5, Tr. 312).
Plaintiff, at that time, did not answer that his mental health
interfered with his compliance, nor did he indicate that he did
not understand the nature of his condition or how to comply with
prescribed treatment.  (Docket Entry # 13-5, Tr. 312).  Rather,
plaintiff relayed to the ALJ that he struggles to control his
condition because he often oversleeps and misses his morning
dose of insulin.  (Docket Entry # 13-5, Tr. 312).  The ALJ thus
properly considered the reasons for plaintiff's noncompliance
and was permissibly mindful of plaintiff's history of
noncompliance in making her finding as to disability.  See SSR
16-3p, 2017 WL 5180304, at *9-10; see also Balaguer v. Astrue,
880 F.Supp.2d at 269.

2.  Reliance on Plaintiff's Activities of Daily Living

Plaintiff also submits that the ALJ impermissibly considered his activities of daily living in making her RFC determination. (Docket Entry # 17). Plaintiff maintains that the ALJ essentially equated his ability to perform simple tasks, such as making a sandwich and watching television, with an ability to perform full-time work. (Docket Entry # 17). The Commissioner responds that the ALJ properly considered the inconsistency between plaintiff's daily activities and his subjective complaints of disability as but one reason to support a negative credibility finding. (Docket Entry # 19). The Commissioner is correct.

"While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (citing Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir. 1991)). The ALJ in this case did the latter. She did not, as plaintiff suggests, equate his ability to make a sandwich with an ability to perform full-time work. Rather, she properly contrasted plaintiff's allegations of disabling limitations with his daily activities and considered the discrepancy as but one factor in determining plaintiff's credibility. See Coskery v. Berryhill, 892 F.3d 1, 7 (1st Cir.

2018) ("[W]e do not see how the ALJ can be said to have acted in contravention of the requirements of SSR 16-3p in considering the evidence of Coskery's daily activities."). As the Commissioner notes, the ALJ considered other factors in finding plaintiff's subjective allegations of disability inconsistent with the record as a whole, including his relatively conservative mental and physical health treatment, his "largely intact physical, cognitive, and emotional functioning" for the relevant period, and the fact that he was able to successfully travel outside of the continental United States without evidence of needing assistance. (Docket Entry # 13-2, Tr. 29). The ALJ thus reasonably found plaintiff's subjective complaints to be inconsistent with the record, and plaintiff has shown no error. See Flood v. Colvin, Civil Action No. 15-2030, 2016 WL 6500641, at *1 (1st Cir. Oct. 20, 2016) (upholding ALJ's decision to discount claimant's subjective complaints based on history of conservative treatment, lack of supporting objective medical evidence, and claimant's daily activities).

3. Failure to Account for Loss of Concentration in the RFC

Finally, plaintiff argues that ALJ erred in adopting an RFC that, plaintiff contends, does not account for plaintiff's loss of concentration, persistence, and pace. (Docket Entry # 17). The Commissioner maintains that the ALJ adequately accounted for

plaintiff's moderate limitations in her calculation of the RFC. (Docket Entry # 19).  Here again, the Commissioner is correct.

With respect to an ALJ's RFC determination, remand is proper where the ALJ failed to properly develop her findings and conclusions regarding the claimant's limitations and the effects those limitations had, if any, on the claimant's RFC.  Anderson v. Berryhill, 368 F.Supp.3d 128, 136 (D. Mass. 2019). Generally, "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'"  Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)).  Rather, "the ability to perform simple tasks differs from the ability to stay on task.  Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."  Id.  An ALJ may properly account for a claimant's ability to stay on task "'by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.'"  Le v. Colvin, Civil Action No. 15-30157-KAR, 2016 WL 7104835, at *11 (D. Mass. Dec. 5, 2016) (quoting

St. Clair v. Colvin, Civil Action No. 13-00571, 2015 WL 5310777, at *16 (W.D. Va. Sept. 11, 2015)).

In the case at bar, the ALJ adequately accounted for plaintiff's moderate difficulties in concentration, persistence, and pace by relying on the opinions of the consultative examiners and other medical sources who translated those limitations into specific, work-related abilities.  For example, in determining the RFC, the ALJ cited the opinion of Dr. Husson, who acknowledged that plaintiff has some limitations involving pace, persistence, and concentration from an emotional perspective, and nonetheless found that plaintiff could follow short, basic instructions and interact normally with others. (Docket Entry # 13-2, Tr. 27) (Docket Entry # 13-14, Tr. 1121- 22).  Moreover, the ALJ afforded "significant weight" to the opinions of Drs. Cohen and Whitehorn, who found that plaintiff had "moderate difficulties with concentration," but nonetheless remained capable of performed short, simple tasks and "relating adequately with others."  (Docket Entry # 13-2, Tr. 21).  The ALJ thus did not fail to account for plaintiff's limitations in maintaining pace, persistence, and concentration in her ultimate adoption of the RFC.  See Mascio v. Colvin, 780 F.3d at 638.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[24] that plaintiff's motion for an order reversing or remanding the decision of the Commissioner (Docket Entry # 16) be **DENIED**.  This court further **RECOMMENDS**[25] that the Commissioner's motion to affirm the decision of the Commissioner (Docket Entry # 18) be **ALLOWED**.


        /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[24]  Any objection to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  See Fed. R. Civ. P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.
[25]  See the previous footnote.