UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDDIE ECHEVARRIA MALDONADO,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW W. SAUL,<br>*Commissioner of Social Security*,[1]<br><br>    Defendant. | Civil Action No. 18-cv-11255-ADB |

## **MEMORANDUM AND ORDER ADOPTING REPORT AND RECOMMENDATION**

BURROUGHS, D.J.

    This is an action for review of a final decision of the Commissioner of Social Security, in which the Commissioner found that Plaintiff Eddie Echevarria Maldonado ("Plaintiff") was not disabled under the Social Security Act and, accordingly, denied Plaintiff's claim for Social Security Disability Insurance and Supplemental Security Income. Currently before the Court is the Report and Recommendation of Magistrate Judge Marianne B. Bowler and Plaintiff's objections thereto. [ECF Nos. 30, 31].

## **I.    BACKGROUND**

    On September 21, 2018, Plaintiff moved for an order reversing and remanding the decision of the Commissioner, [ECF No. 16], and on October 24, 2018, the Commissioner moved for an order affirming the decision, [ECF No. 18]. On February 6, 2019, the Court referred this case to Magistrate Judge Bowler for a Report and Recommendation on the parties' cross-motions. [ECF No. 21]. After a hearing on March 4, 2019, Magistrate Judge Bowler

---

[1] The Court substitutes Andrew Saul for former defendant Nancy A. Berryhill, as Commissioner Saul became the Social Security Administration's Acting Commissioner in June 2019. See Fed. R. Civ. P. 25(d).

issued her Report and Recommendation on September 4, 2019, recommending that the Commissioner's motion be allowed and that the Plaintiff's motion be denied. [ECF No. 30 ("R. & R.") at 92]. Plaintiff filed objections to the Report and Recommendation on September 13, 2019. [ECF No. 31]. The Commissioner responded to Plaintiff's objections on September 25, 2019. [ECF No. 32].

## II. DISCUSSION

In accordance with 28 U.S.C. § 636(b), the Court must make a *de novo* determination of those portions of the Report and Recommendation to which the Plaintiff has objected. Here, Plaintiff raises seven objections to the Magistrate Judge's Report and Recommendation. See [ECF No. 31]. The Court responds to each of Plaintiff's objections below.

### A. Weight Afforded LCHC-BH Treatment Team Report

Plaintiff makes two arguments in support of his objection that the ALJ erred by giving "little to no probative weight" to a mental impairment questionnaire prepared by a team of providers from Lowell Community Health Center Behavioral Health Services ("LCHC-BH"), which included Dr. Neelam Sihag, therapist Olga Madrid, and prescribing nurse Martha Root. See [ECF No. 31 at 2–6; Tr. 28, 1974–79]. First, he argues that Dr. Sihag was an acceptable medical source ("AMS") and thus the mental impairment questionnaire signed by Dr. Sihag, Ms. Madrid, and Ms. Root[2] (the "LCHC-BH Report") was a treating source opinion.[3] See [ECF No.

---

[2] There is some confusion as to who signed the LCHC-BH Report. The report contains lines for a signature and a co-signature. [Tr. 1979]. Ms. Madrid signed the signature line, and Dr. Sihag signed the co-signature line; both signatures are dated April 14, 2016. [Id.]. Ms. Root's signature appears near the signature block, and her signature is dated April 8, 2016. [Id.]. Ms. Root's name was also crossed out on the first page of the report. [Id. at 1974]. Whether Ms. Root signed the report is irrelevant, as she was not a treating source at the time the SSI claim was filed or when the ALJ rendered her opinion. See [R. & R. at 66].

[3] A "treating source" is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation" and has or

2

31 at 2–4]. There is no dispute that Dr. Sihag is an AMS because she is a licensed physician. See 20 C.F.R. § 404.1502(a). Plaintiff also agrees that Dr. Sihag was not personally a treating source. See [ECF No. 31 at 2]. Plaintiff, however, cites to SSA internal operating instructions about how to confirm that evidence is from an AMS, which state that medical evidence should be considered to be from an AMS if it shows that the "AMS had a role in the care or evaluation of the individual alone or as part of an interdisciplinary team, (such as treating, examining, interpreting test results, reviewing treatment records, or overseeing treatment)." [ECF No. 31 at 3]. Based on these instructions, Plaintiff concludes that if Dr. Sihag is an AMS and oversaw treatment, then the LCHC-BH Report is a treating source opinion. See POMS DI 22505.003(B)(1); [ECF No. 31 at 3 ("If Dr. Sihag is an AMS, overseeing treatment as she does, then the team is just what it appears to be, a treating source.")]. Plaintiff's logical leap is not supported by law. See [R. & R. at 63–65, 67–75]. The Court therefore overrules this objection after *de novo* review for the reasons articulated by the Magistrate Judge in her Report and Recommendation. See [id.].

Second, Plaintiff claims that the ALJ violated SSR 06-03p by not relying on the LCHC-BH Report, which was signed by Ms. Madrid, Plaintiff's therapist. [ECF No. 31 at 4]. Pursuant to SSR 06-03p, an ALJ may use evidence from "other sources" including therapists "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."[4] SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). The regulation also notes that opinions from "medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, . . . are important and

---

had "an ongoing treatment relationship with [the claimant]." See 20 C.F.R. §§ 404.1502, 416.902.

[4] SSR 06-03p was rescinded as of March 27, 2017, but was in effect at the time of the ALJ's hearing. See [ECF No. 31 at 4].

3

should be evaluated on key issues such as impairment severity and functional effects . . . ." Id. at
*3.  In addition, 20 C.F.R. § 404.1527(f)(1) permits a therapist's opinion to be given greater weight than an AMS, on the basis of familiarity with a patient, but only if "the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f)(1).  Here, the ALJ properly relied on medical evidence from Ms. Madrid, including her treatment notes, see [Tr. 25–27 (citing Exhibits 52F and 59F)], but did not rely on the LCHC-BH Report because it was inconsistent with Plaintiff's current medical records, see [Tr. 28]; see also [ECF No. 32 at 2].  In so doing, the ALJ complied with SSR 06-03p.  Accordingly, following *de novo* review, the Court concludes that there was no error and overrules this objection.

### B. Dr. Morocco's Report and Social Limitations in the RFC

Plaintiff objects to the ALJ's decision to omit social limitations from the residual functional capacity ("RFC") determination.  [ECF No. 31 at 5–6].  As she may, the ALJ gave "significant weight" to the state agency psychological consultants both on initial consideration and reconsideration.  [Tr. 20–21].  In their mental RFC assessments, which were issued on May 14, 2014 and November 11, 2014, the state agency psychological consultants opined that Plaintiff had "no social impairments," "no social interaction limitations," and "no difficulties getting along with others in past work." [Tr. 365, 409–10].  The ALJ relied on these opinions at step three when determining that the "paragraph B" criteria were not satisfied, a finding Plaintiff does not object to.  [Tr. 21].  The ALJ also explained that her RFC assessment reflected her conclusions from the "paragraph B" mental function analysis.  [Tr. 21–22].

Plaintiff raises a potential inconsistency between the lack of social limitations in the RFC and the "great weight" afforded by the ALJ to the opinion of Daniel Morocco, Ed.D., another state agency consultant. [ECF No. 31 at 6–7].  Unlike the reviewing state agency psychological

consultants on initial consideration and reconsideration, Dr. Morocco opined on May 20, 2014 that Plaintiff "may have difficulties relating to many different individuals." [Tr. 1099]. There was no error, however, because the ALJ only gave "great weight" to Dr. Morocco's opinion to the extent that his report was consistent with the record. [Tr. 27]. Dr. Morocco's conclusion about Plaintiff's potential social limitations was not consistent with the record, see [Tr. 20 (noting that "the record at no time suggests that [Plaintiff] exhibited any issues interacting normally with his various medical providers and the record consistently documents [his] reports of some range of social activities")], and, as such, was not required to be afforded great weight along with the remainder of Dr. Morocco's opinion.[5] See SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996) (stating that an ALJ may give weight to state agency consultant opinions "only insofar as they are supported by evidence in the case record"). To the extent that Plaintiff argues that Dr. Morocco's report was consistent with the LCHC-BH Report, the Court has already overruled Plaintiff's objection regarding the ALJ's decision to give "little to no probative weight" to the LCHC-BH Report. Therefore, the Court overrules this objection after *de novo* review of the ALJ's decision.

C. **Reliance on State Agency Psychological Assessments**

Plaintiff asserts that the ALJ's reliance on state agency psychological opinions that were written in June 2014 and November 2014 was improper because the reviewing doctors did not have the benefit of later treatment records from LCHC-BH, which he claims included a diagnosis change in January 2016 from "major depression with psychosis" to "schizoaffective disorder." See [ECF No. 31 at 7–8]. Plaintiff argues that the newer evidence from LCHC-BH "shows that

---

[5] In addition, as the Commissioner notes, "[b]ecause Dr. Morocco did not translate this qualified statement into actual or expected limitations, it was not an opinion the ALJ was required to weigh" on the issue of Plaintiff's ability to relate to others. [ECF No. 32 at 3–4].

5

[Plaintiff's] mental health impairments appear to have become more involved" and "morphed in character to a new level of impairment." [Id. at 8].

Plaintiff's characterization of the medical evidence is misleading. Plaintiff was assessed with schizoaffective disorder as early as May 12, 2015. [Tr. 2037]. His treatment records reflect a vacillating diagnosis between "major depressive disorder, recurrent, severe with psychotic symptoms" and "schizoaffective disorder, depressive type," even on the same day. See [R. & R. at 34–35; Tr. 2036 (Madrid's progress notes from May 12, 2015 noting patient has "severe recurrent major depression with psychotic behavior"), 2037 (Root's progress notes from May 12, 2015 noting patient has "schizoaffective disorder, depressive type")]; see, e.g., [Tr. 2011, 2015, 2030, 2031]. Based on these treatment records, the ALJ correctly observed that Plaintiff's treatment remained relatively stable through 2016 and "appointments dated well through 2016 reflect ongoing subjective symptomology addressed by little to minimal changes in his medication regimen." [Tr. 25]; see also [ECF No. 32 at 5]. Because this objection is based on a mischaracterization of the medical evidence and the Court agrees with the Magistrate Judge's conclusions, this objection is overruled on *de novo* review. See [R. & R. at 75, 77–78].

### D. Treatment of Subjectively Reported Symptoms

Plaintiff objects to "the [ALJ's] overall approach," "particularly to [Plaintiff's] mental health treatment." [ECF No. 31 at 8]. This objection appears to be referencing the ALJ's underlying decision denying Plaintiff benefits and contests the ALJ's treatment of the LCHC-BH Report rather than raising a specific objection as to any factual finding or legal conclusion in the Report and Recommendation. See [id.]. The Court after *de novo* review overrules Plaintiff's objection for the reasons articulated by the Magistrate Judge in her Report and Recommendation. See [R. & R. at 70–72].

### E. Consideration of the Effects of Diabetes

Plaintiff makes two arguments related to his objection to the ALJ's assessment of his diabetes and its comorbidities. First, Plaintiff argues that the ALJ failed to consider "all of the plaintiff's impairments, both severe and non-severe" in assessing the RFC; specifically he asserts that the ALJ did not consider that his "diabetes . . . [is] frequently out of control, interacting with [his] mental health issues," and "[b]oth must be considered together" pursuant to SSR 14-2p.[6] [ECF No. 31 at 8–9]. Because the ALJ found at step four that Plaintiff's physical limitations were actually greater than what was opined by state agency consultants due to his diabetic neuropathy, see [Tr. 29], the Court understands Plaintiff's objection to relate to the ALJ's consideration of Plaintiff's mental health at step four and its impact on the RFC. This argument reprises Plaintiff's objections to the ALJ's treatment of the LCHC-BH Report, Dr. Morocco's report, and state agency psychological assessments, all of which have been overruled.

---

[6] SSR 14-2p provides a five-step evaluation process for making a determination as to whether an adult is disabled due to diabetes mellitus ("DM"), including:

> We determine at step 2 whether an adult has a medically determinable impairment (MDI) that is severe. . . . If an adult does have a severe impairment(s), we go on to step 3 of the sequential evaluation process. . . . We next determine at step 3, whether the impairment(s) meets or medically equals a listing . . . . DM is not a listed impairment for adults. However, the effects of DM, either alone or in combination with another impairment(s), may meet or medically equal the criteria of a listing . . . . When the effects of DM, alone or in combination with another impairment(s), are severe but do not meet or medically equal the criteria of a listing, we assess an adult's residual functional capacity (RFC). . . . We consider all work-related physical and mental limitations, whether due to an adult's DM, other impairment(s), or combination of impairments. . . . We then proceed to step 4 and, if necessary, step 5 of the sequential evaluation process. We use the RFC assessment at step 4 to evaluate whether an adult is capable of performing any past relevant work (PRW) . . . .

SSR 14-2p, 2014 WL 2472008, at *5–7 (June 2, 2014).

Second, Plaintiff contends that the ALJ "appeared to ignore" the effect of diabetes on Plaintiff's eyes stemming from macular edema and diabetic retinopathy, including failing to explore the issue at his hearing, which "allowed for a large, undeveloped gap in the evidence." [ECF No. 31 at 9–10]. Once again, Plaintiff misconstrues the evidence in the record. At the hearing, the ALJ specifically inquired about Plaintiff's eyesight, and he responded that "[r]ight now it's fine" because of recent surgeries. [Tr. 319]. Plaintiff's argument is based on records from March 2015, [ECF No. 31 at 9 (citing Tr. 1445)], but later records indicate that, while he continued to have diabetic retinopathy, his "condition ha[d] improved" as of April 2016 and "[was] stable" in August 2016. [Tr. 47, 49]. As the Commissioner notes, Plaintiff has failed to identify any evidence of vision limitations that the ALJ omitted from her analysis. [ECF No. 32 at 7]. Thus, upon *de novo* review, this objection is also overruled.

### F. Relationship Between Mental Health and Treatment Compliance

Plaintiff objects that the ALJ did not comply with SSR 16-3p when she found that Plaintiff's allegations of disabling limitations were inconsistent with the medical evidence based, in limited part, on his noncompliance. See [Tr. 29 ("While not dispositive behavior, I [am] mindful that the record reflects some noncompliance with prescribed treatment, particularly, with respect to his diabetic neuropathy.")]. SSR 16-3p allows an ALJ to make this finding if an individual fails to follow prescribed treatment, but requires that the ALJ first consider possible reasons the plaintiff may not comply with treatment. See SSR 16-3P, 2017 WL 5180304, at *9 (Oct. 25, 2017). Here, the ALJ specifically inquired into Plaintiff's non-compliance at his hearing, and Plaintiff represented that he sometimes takes his morning dose of insulin late but does not miss doses altogether.[7] Plaintiff acknowledges this testimony, but argues that the ALJ

---

[7] At his hearing, Plaintiff testified as follows:

8

should have considered the possible impact of Plaintiff's mental health on his noncompliance. [ECF No. 31 at 10 (stating that Plaintiff's "emotional state might well have presented complications in his compliance")]. Plaintiff's argument is wholly speculative and identifies no evidence in the record setting out a link between Plaintiff's mental health and his noncompliance from which the ALJ could have drawn this conclusion. Following a *de novo* review, the Court concludes that the ALJ followed the procedures set out by SSR 16-3p, and that there was no error.

### G. Consideration of Plaintiff's Activities of Daily Living

Plaintiff argues that the ALJ improperly considered Plaintiff's activities of daily living ("ADLs"), including a trip to Puerto Rico, by failing to link her review of Plaintiff's ADLs to work-like activity. See [ECF No. 31 at 11–12]. Plaintiff overlooks that the ALJ did not rely on the ADLs as evidence of work-like activity or attempt to equate his ADLs to work-like activity, but instead considered his ADLs as one factor in her negative credibility finding. See [Tr. 22–23, 29 ("[S]everal reasons led me to find [Plaintiff's] allegations of disabling limitations

---

> Q: So now you're on two types of insulin, so why are you still having difficulty with diabetes?
> A: I have- I have- Some days it's normal, but some days it gets uncontrolled. These last few days I've had it from 260 to 300.
> Q: But you've also told your doctors that there are days when you don't take your medication. You don't take them when you're supposed to and sometimes you miss doses all together. So why don't you take your medication?
> A: I've always taken them. The problem is that I'm supposed to have the insulin when I wake up right after breakfast, at noon, at 3pm and at 5pm. Some days I don't wake up at 8 or 9, I wake up at 10 because the pain in my legs doesn't help.
> Q: So you're saying that you just miss your morning dose?
> A: No, I take it, but I don't take it at 8am. I take it at 9:30am or 10am when I wake up.

[Tr. 312].

generally inconsistent with the available medical evidence of record. . . . [He] has maintained such stability with admitted range of daily activities . . . .")]. After *de novo* review, the Court overrules this objection for the reasons articulated by the Magistrate Judge in her Report and Recommendation. See [R&R at 87–89].

### III. CONCLUSION

Accordingly, the Court ACCEPTS and ADOPTS in full the Report and Recommendation of Magistrate Judge Bowler, [ECF No. 30]. Plaintiff's motion for an order reversing the Commissioner's decision, [ECF No. 16], is DENIED, and the Commissioner's motion for an order affirming the Commissioner's decision, [ECF No. 18], is ALLOWED. Pursuant to 42 U.S.C. § 405(g), the final decision of the Commissioner is hereby AFFIRMED. The Clerk is directed to enter judgment for the Commissioner, and this case may now be terminated.

**SO ORDERED.**

September 26, 2019 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE